**LOUISVILLE AND NASHVILLE RAIL-ROAD COMPANY**

v.

**PUBLIC SERVICE COMMISSION OF TENNESSEE, State Board of Equalization of Tennessee, et al.**

**No. 4310.**

United States District Court
M. D. Tennessee,
Nashville Division.

Feb. 1, 1966.

David M. Keeble, Hooker, Keeble, Dodson & Harris, Nashville, Tenn., W. L. Grubbs and Philip M. Lanier, Louisville, Ky., for plaintiff.

Milton P. Rice, Asst. Atty. Gen. of Tennessee, Nashville, Tenn., and Eugene W. Ward, Morristown, Tenn., for defendants.

WILLIAM E. MILLER, Chief Judge.

This action presents the question whether a federal court may intervene to grant injunctive relief to a taxpayer whose property, in violation of state law, has been substantially over-assessed in relation to other taxpayers in the state. Since tax laws are ancient and unrelenting, they have spawned much litigation, and the Court is not without some guidelines in the decision of the present controversy.

Jurisdiction is invoked on the grounds of (1) federal question jurisdiction (commerce clause and Fourteenth Amendment), and (2) diversity jurisdiction. The first is denied by the defendants, and the second is admitted. Because the Court has concluded that jurisdiction exists under the equal protection clause, it is not necessary to determine whether or not relief could be granted if diversity were the sole basis of jurisdiction. The Court notes, however, that such relief might well be barred by the holding in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and subsequent cases.

■ In Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947), for example, the Court stated that:

The essence of diversity jurisdiction is that a federal court enforces State law and State policy. If North Carolina has authoritatively announced that deficiency judgments cannot be secured within its borders, it contradicts the presuppositions of diversity jurisdiction for a federal court in that State to give such a deficiency judgment. * * * A federal court in North Carolina, when invoked on grounds of diversity of citizenship, cannot give that which North Carolina has withheld. Availability of diversity jurisdiction which was put into the Constitution so as to prevent discrimination against outsiders is not to effect discrimination against the great body of local citizens.

Cases like * * * are obsolete insofar as they are based on a view of diversity jurisdiction which came to an end with Erie Railroad Co. v. Tompkins, 304 U.S. 64 [58 S.Ct. 817]. That decision drastically limited the power of federal district courts to entertain suits in diversity cases that could not be brought in the respective State courts or were barred by defenses controlling in the State courts. (pp. 191–192, 67 S.Ct. p. 662).

See also, Ragan v. Merchants Transfer & Warehouse Co., 337 U.S. 530, 532, 69 S.Ct. 1233, 1234, 93 L.Ed. 1520 (1949) ("[i]f recovery could not be had in the state court, it should be denied in the federal court.") And see, Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); Allstate Insurance Company v. Charneski, 286 F.2d 238, (7th Cir., 1960); Berger v. State Farm Mutual Automobile Co., 291 F.2d 666 (10th Cir., 1961); and Arrowsmith v. United Press International, 320 F.2d 219 (2d Cir., 1963). Cf., Byrd v. Blue Ridge Cooperative, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); and Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). It is admitted that if the plaintiff brought suit in a Tennessee state court, relief would be barred by the Tennessee rule that a taxpayer cannot sue to have his own taxes reduced; he may sue only to have the taxes of his neighbors increased, and then, only if he can first show that his property is assessed in excess of actual cash value. See e. g., Carroll v. Alsup, 107 Tenn. 257, 284, 64 S.W. 193, 200 (1901); McCord v. Nashville. Chattanooga & St. L. Ry., 187 Tenn. 277, 213 S.W.2d 196 (1948); Mayor and Aldermen of the Town of Morristown v. Burke, 207 Tenn. 180, 338 S.W.2d 593 (1960); and Biltmore Hotel Court v. City of Berry Hill, Tenn., 390 S.W.2d 223 (1965). A citizen of Tennessee, then, could not win this action in a state court under existing state law, and he could not, because of lack of diversity, bring the action in a federal court. No sufficient reason appears why a non-citizen of this state should be able to invoke diversity jurisdiction in a federal court to reach a result on a state question which state citizens could not reach.

In Tennessee, all railroad and utility property is assessed by the Public Service Commission. All other property is assessed by county assessors and local officials. Both the Commission and county assessors are required by state law to assess all property within their respective jurisdictions at its actual cash

value. (See Appendices "A" and "B.") The assessment roles of all property assessed by county assessors are brought before the respective county boards of equalization, whose duty it is to equalize the assessment of all property within the county by assessing all property at its actual cash value. (See Appendix "B.") The equalized assessments of the county boards, and the assessments of the Public Service Commission, are reviewed by the State Board of Equalization, whose duty it is to equalize the various county board assessments and the Public Service Commission assessments upon the basis, for all property, of actual cash value. (See Appendix "B."). The State Board of Equalization then certifies back to each county the final equalized assessment of the properties assessed by that county, and to the Public Service Commission the final equalized assessment of the properties assessed by the Commission. The latter certification was made with respect to plaintiff's property on November 23, 1965. Because of the pendency of this action and the issuance of a temporary restraining order, the Public Service Commission has not yet certified to the various counties and municipalities in which the plaintiff's property is located, the final assessed value of plaintiff's property. Following certification to the counties and municipalities, the taxes based upon the certified assessments will become due and payable.

The plaintiff in this civil action seeks to restrain the Public Service Commission from certifying assessments for the years 1965–66 on all of the property of the plaintiff located in the state. It alleges that if the certification is not enjoined, the plaintiff will have to pay taxes to 54 counties and to at least 104 municipalities and will be without an adequate remedy under state law to obtain relief from what it claims is an illegal assessment of its property.

Plaintiff alleges that property assessed by the Public Service Commission is assessed at actual cash value, and that property assessed by county assessors is assessed at a state-wide average of 30% of actual cash value, with assessments ranging from a low of 7% to a high of 50%. It is alleged that this practice is systematic and intentional, and of long-standing. The defendants admit that property assessments are not uniform throughout the state, that assessments have been at less than 100% of actual cash value, and that "railroad and utility properties, being centrally assessed by the Public Service Commission, are generally assessed at a level considerably higher than the level at which locally assessed properties are assessed." The defendants, however, would hold the plaintiff to strict proof both of the exact percentage of the plaintiff's assessment, and the exact percentage at which local properties are assessed. Nevertheless, even by the defendants' own admission, the plaintiff's property is assessed at not less than 55 or 65% of its actual cash value; and the evidence before the Court clearly demonstrates that all other properties are assessed at a state-wide average of not more than 30% of their actual cash value. (See Appendix "C.")

Defendants concede that the Public Service Commission is required by law to assess plaintiff's property at its actual cash value. They contend, however, that the Commission disregarded state law and assessed plaintiff's property at only 60 to 70% of actual cash value. Since the State Board of Equalization reduced the Commission's assessment by approximately 5%, defendants claim that plaintiff's final, equalized assessment is only 55 to 65% of actual cash value. This claim is based upon the fact that the Commission's assessment calculations included a "judgment factor." Defendants claim that this judgment factor was applied after the Commission had first determined actual cash value. Plaintiff claims that the judgment factor was applied in order to determine the actual cash value. The transcript of the hearing before the State Board would seem to support plaintiff's position. At

the hearing, the following exchange took place:

> Mr. Clyde W. Key: May I ask Dr. White a couple of questions? [Dr. White is the tax and rate consultant to the Public Service Commission]
>
> The Chairman: Yes, sir.
>
> Mr. Key: Dr. White, your ultimate goal is to reach actual cash market value after application of your seventy percent factor, and your judgment factor, is that correct?
>
> Mr. White: Yes, sir.
>
> The Chairman: Mr. Key, you know we are not going to admit anything except one hundred percent assessment. (Tr. pp. 5-6)

It is not necessary, however, to determine whether or not the Commission assessed the plaintiff's property at actual cash value, since a final, equalized assessment of even 55% (which is the lowest assessment claimed by the defendants) is substantially higher than the average assessment percentage of locally assessed property, either state-wide or in the 54 counties through which plaintiff operates. By referring to the Tennessee Taxpayers Association Report in Appendix "C," and calculating the average assessment ratio of the 54 counties through which the plaintiff operates, it appears that the locally assessed properties in those counties are assessed at an average of approximately 20% of actual cash value. Thus, even on the basis of defendants' contention that plaintiff's property is assessed at only 55 to 65% of actual cash value, there would be a discrimination against plaintiff's property and in favor of locally assessed property of 35 to 45% in the counties through which plaintiff operates. If, on the other hand, the Court were to agree with plaintiff that its property had been assessed at full cash value by the Public Service Commission, then, taking into account the fact that the State Board of Equalization reduced the Commission's assessment by 5%, there would be a disparity in assessment ratios between the assessment of plaintiff's property and locally assessed property in the counties through which plaintiff operates of 75%. Under either approach, there exists in the challenged assessment a clearly invidious discrimination which is systematic, intentional, and of long-standing.

■ Nashville, Chattanooga & St. L. Ry. v. Browning, 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254 (1940) involved almost identical facts and constitutional claims. The case arose under Tennessee's 1932 Code § 1526 [now 67–918] which made it the duty of the railroad and public utilities commission [now the Public Service Commission] to assess all railroad property at its "actual cash value." The Commission so assessed the railroad's property, and the railroad appealed to the State Board of Equalization on the ground that all property not assessed by the Commission was assessed at substantially less than actual cash value in violation of 1932 Code § 1349 [now 67–605]. The Board confirmed the Commission's assessment, and the railroad then brought suit in the Circuit Court for Davidson County to have the action of the Board reviewed. The trial judge dismissed the petition and the railroad appealed to the Supreme Court of Tennessee. That Court found that the railroad's evidence did not overcome the presumption that the State Board had equalized all property at its actual cash value, and on this ground affirmed the trial court's dismissal. The railroad then petitioned the Supreme Court of the United States for certiorari, which was granted. The Court first dismissed the railroad's commerce clause claim. The claim was based on the fact that the Commission's assessment was arrived at by determining the value of the railroad's property in all states, and taking a percentage of that value, which represented the ratio of the railroad's track mileage in Tennessee to its total track mileage, as the value of the railroad's property in Tennessee. In the present case, however, the commerce clause claim is quite different. The railroad contends that the amount of taxes paid in Tennessee is much higher than the amount of taxes

paid in other states and is, indeed, so much higher as to restrain interstate commerce. The railroad, however, does not allege or contend that its properties are being taxed any higher than purely intra-state railroads or intra-state utilities, and for this reason the railroad's commerce clause objection is without merit.

■■ In *Browning*, the Court denied the railroad's equal protection claim under the Fourteenth Amendment on the ground that the evidence before the Court did not warrant the overturning of the express finding of the Supreme Court of Tennessee that the railroad had not proved discrimination. There was nothing in the record before the Court to indicate that the Tennessee State Board of Equalization had not equalized all property within the state at its actual cash value, and the Court therefore accepted the express finding of fact of the Supreme Court of Tennessee on this issue. If that were all the Court had to say on the railroad's Fourteenth Amendment claim, the case would not be of any concern in the present litigation since we have before us no such finding of fact by the Tennessee Supreme Court, but instead, conclusive evidence to the contrary. The Court proceeded, however, to consider the railroad's equal protection claim as if the State Supreme Court had found that the railroad was, in fact, treated differently for tax purposes from the majority of property owners in the state. Since this latter consideration was clearly unnecessary to the decision of the case, it would appear that the Supreme Court's discussion concerning it may be regarded as dicta. Nevertheless, the words of the Supreme Court, though dicta, should be respected and followed by this Court unless there are compelling reasons to believe that the Supreme Court itself would not apply such dicta to the facts of this case. The Court is of the opinion that such compelling reasons do exist, and that the Supreme Court on the basis of the present record, and in the light of the unambiguous provisions of the Tennessee Constitution and statutes, as well as the authoritative rulings of its highest court, would not follow the manifestly erroneous conclusion that state law permitted or allowed classifications of property for tax purposes.

■ Basically, the Court in *Browning* reasoned as follows: the states have the power to establish different classes of property for tax purposes; if such classes are reasonable, different treatment for taxpayers in different tax classes raises no equal protection problem; if railroads and utilities were placed by the states into one class and all other property into another class, such a classification would be reasonable; therefore, since "so far as the Federal Constitution is concerned, a state *can* put railroad property into one pigeonhole and other property into another, *the only question relevant for us is whether the state has done so.*" (p. 369, 60 S.Ct. p. 972, emphasis supplied). This question is relevant because the Fourteenth Amendment commands equality of treatment unless the state has established different and reasonable classes of property. In the absence of classification by the state, there is no federal classification which would permit different tax treatment for railroads. With this reasoning, no one can argue. The difficulty with the *Browning* opinion lies in its finding that state law had, in fact, established different classes of property. It is beyond question that both now and at the time of the *Browning* decision, the Tennessee Constitution expressly prohibits the classification of property for tax purposes. (See Appendix "A.") It is equally clear that both now and at the time of the *Browning* decision, the Tennessee statutes, with criminal sanctions, in terms admitting of no doubt or uncertainty, prohibit the classification of property for tax purposes, or the valuation of any property at less than its actual cash value. (See Appendix "B.") The Supreme Court made no specific reference to these explicit constitutional and statutory provisions, stating that a "practice, systematic, unbroken for more than forty years," of treating railroads and utilities differ-

ently from other properties, demonstrated that state "law" provided for the classification. The Supreme Court looked at this "settled state practice" as a "gloss" upon the state statutes, and, inferentially, as a gloss upon the state constitution. In traditional jurisprudence, such a gloss is relied upon to construe state law only if the state constitution or the state statutes are ambiguous, which the Tennessee Constitution and statutes admittedly are not. Still, even if we should assume that the State Constitution and statutes are ambiguous, state practice can be relied upon as a gloss only if there is no judicial determination of the meaning of the State Constitution and statutes by the state courts, for the reason that the state's highest court, not the United States Supreme Court, is the final authority with respect to what is, and what is not, state law. *Browning,* then, should fairly be regarded as having been based upon the assumption that the Tennessee law on the question of classification of property for tax purposes was not clear, or had not been authoritatively settled by the State's Supreme Court. Indeed, the Supreme Court did not cite a single state court decision. The Court's principal reference to the state courts was as follows: "[*I*]*f* the state supreme court *had* construed the requirement of uniformity in the Tennessee Constitution so as to *permit* recognition of these diversities, no appeal could successfully be made to the Fourteenth Amendment." (p. 369, 60 S.Ct. p. 972, emphasis supplied). In fact, however, the State Supreme Court long before *Browning* had construed the requirement of uniformity in the Tennessee Constitution as expressly prohibiting the under-assessment or under-taxation of any type or species of property, a decision from which it has never deviated.

Carroll v. Alsup, 107 Tenn. 257, 64 S.W. 193 (1901) did not involve a Public Service Commission assessment but it demonstrates conclusively that state law requires that for assessment and taxing purposes all property within the state shall be treated as a single class; that all

property shall be assessed at actual cash value; and that all taxes shall be equal and uniform:

There are, then, two fundamental principles to be taken as guides in assessing property under our constitution and laws: (1) That *all property* shall be assessed at its actual cash value; and (2) that taxes shall be equal and uniform. * * * However difficult it may be to arrive at the first result, it is *imperatively demanded by the constitution and laws,* and the second unavoidably and from necessity follows it, and to adopt a cash valuation is the only basis upon which it is practicable to make taxes equal and uniform. (p. 283, 64 S.W. p. 199, emphasis supplied).

* * * The recourse offered to the taxpayer is not to reduce his own assessment unless it is beyond its actual cash value, but to have that of his neighbor increased until *both* reach the point of actual cash value, and thus become equal and uniform, *as the law provides and the constitution contemplates.* This idea is manifested in many provisions of the statute, not necessary to be specifically pointed out. It may be found in every section that refers to value. (p. 284, 64 S.W. p. 200 emphasis supplied).

* * * We will not stop to comment on these cases further than to say that the doctrine of assessment and taxation upon a percentage of value, instead of true value or actual cash value, finds no warrant in the language used in the Reelfoot Lake Case. (p. 289, 64 S.W. p. 201).

* * * But it by no means warrants the idea that a percentage of value may be made the basis of assessment, but, on the contrary, the "actual value" or "true value" or "cash value," now, the expressions being synonymous, are made the basis by which the tax or value must be graduated or determined. (pp. 289–290, 64 S.W. p. 201).

It was evidently the purpose of the General Assembly, in the Act of 1899, to escape the percentage valuation idea *as to any and every kind of taxable property,* and fix upon the actual cash value as the basis upon which all assessments should be made so as to meet *both requirements of the Constitution,* the assessment of property at its value, and at the same time taxation should be equal and uniform. The Constitution of 1870, Art. 2, Sec. 28, directs that *all property* shall be taxed according to value, that value, to be ascertained in such manner as the Legislature may direct, so that taxes shall be equal and uniform throughout the State, and so that *no species of property* from which a tax may be collected *shall be taxed heavier than any other species of property of the same value.* (p. 290, 64 S.W. p. 201 emphasis supplied).

* * * under our system there is but one basis upon which values can be made finally to rest, and that is the actual cash value, and until that is reached no property is free from the machinery of the law designed to place it on that basis. (p. 291, 64 S.W. p. 201).

* * * and in this way the courts, legislatures, and taxpayers will co-operate to tax *all property* at its actual cash value, and to make all taxes equal and uniform, *as the constitution contemplates.* The actual cash value is the only practicable basis upon which taxes can be made equal and uniform, and this is *clearly the constitutional requirement, the legislative intent,* and should be the effort of the court, as well as taxpayers. (p. 292, 64 S.W. p. 202, emphasis supplied).

And in Mayor and Aldermen of City of Chattanooga v. Nashville, C. & St. L. Railroad Co., 75 Tenn. 438 (7 Leg. 561, 1881), the Court stated:

It is clear from the provisions quoted, that the limitations upon the exercise of the taxing power in reference to all property in our State are, that all property be taxed according to its value, so that taxes shall be equal and uniform throughout the State, and "no one species of property from which a tax may be collected, shall be taxed higher than any other species of property of the same value." (p. 566, 7 Leg.).
* * * and it must be equal and uniform throughout the State, and the assessment so made that no one species of property shall be taxed higher than any other species of the same value. The principle on which the value is ascertained, must necessarily be the same in order to this result. There can be no variable amount demanded or fixed on this value for the whole State, nor in any defined division or territory, as a county or incorporated town, having the power to levy taxes. Such taxes must be levied on the same principle as that prescribed for State taxation * * *. (p. 567, 7 Leg.).

* * * we know of no constitutional principle on which railroad property of this character can be valued by a different rule from that of other citizens. (pp. 574–575, 7 Leg.).

Similarly, in Brown v. Greer, 40 Tenn. 528 (3 Head 695, 1859), the Court stated:

In this case, from the description of slaves, it is clear that they are not assessed at much more than half their cash value. This is a great abuse and ought to be reformed. All property ought to be assessed at their fair value, and that can only be determined by the ordinary selling and buying prices for cash, at the time. To place it any lower than this standard is a palpable dereliction of duty on the part of those whose duty it is made by law to value it, and it is difficult to see how the district or town assessors can reconcile their practice in this respect to their duty, enforced by a solemn oath. (pp. 696–697, 3 Head).

See also, the similar interpretation of state law by the Court of Appeals for this Circuit in Taylor v. Louisville & Nashville R. Co., 88 F. 350 (6th Cir., 1898), which the Supreme Court in *Browning* did not cite or attempt to distinguish.

The Tennessee Supreme Court in decisions subsequent to *Browning* has not departed from the ruling in Carroll v. Alsup that the Tennessee Constitution and statutes require all property to be assessed at actual cash value. See, *e. g.*, McCord v. Nashville, Chattanooga & St. L. Ry., 187 Tenn. 277, 213 S.W.2d 196 (1948); Mayor and Aldermen of the Town of Morristown v. Burke, 207 Tenn. 180, 338 S.W.2d 593 (1960); and Biltmore Hotel Court v. City of Berry Hill, Tenn., 390 S.W.2d 223 (1965).

■ The Court is thus confronted with this situation: The United States Supreme Court, relying solely on a state administrative practice, has stated (although in dicta) that the "law" of Tennessee recognizes different classes of property for tax purposes. On the other hand, the Supreme Court of Tennessee has ruled without exception that the assessment of any property at less than actual cash value is a direct violation of the State Constitution and statutes, which expressly prohibit classification of property for tax purposes. Under these facts, it seems clear that the duty of this Court is not to be guided by the comments of the Supreme Court of the United States as to what the law of Tennessee is, but rather to accept the pronouncements of the highest court of Tennessee, and the unambiguous provisions of that state's constitution and statutes, that any difference in the assessment of railroad and utility property, in relation to other properties, is a flagrant violation of state law. This is especially true in a case where such comments may properly be regarded as dicta, and where the highest court of Tennessee in decisions after the Supreme Court's comments, has made no departure from its own interpretation of state law. Any other ruling in this case would mean that a federal court would be required to accept as the law of the state, not the authoritative rulings of its Supreme Court, but the admittedly conflicting practice of state administrative agencies.

In Tennessee, therefore, there is, for tax purposes, but one class of property, as its laws so emphatically provide. Since the Fourteenth Amendment clearly prohibits unequal treatment within a class, the substantially and systematically higher assessment percentages for railroad and utility property, as opposed to other properties, is a violation of the equal protection clause of the Fourteenth Amendment, and entitles the plaintiff to relief. Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 446, 43 S.Ct. 190, 192, 67 L.Ed. 340 (1923):

> This court holds that the right of the taxpayer whose property alone is taxed at 100 per cent. of its true value is to have his assessment reduced to the percentage of that value at which others are taxed even though this is a departure from the requirement of the statute. The conclusion is based on the principle that where it is impossible to secure both the standard of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law.

In Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352–353, 38 S.Ct. 495, 62 L.Ed. 1154 (1918), the Court ruled:

> The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute *or by its improper execution* through duly constituted agents. And it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed

upon the full value of his property. (emphasis supplied).

Lower federal courts have reached the same result. See, for example, Wyandotte Chemical Corp. v. City of Wyandotte, 199 F.Supp. 582, 584 (E.D.Mich., 1961) (*rev'd* sole ground that Michigan law provided an adequate remedy, 321 F.2d 927 (6th Cir., 1963)):

> Improper execution of the laws through duly constituted agents, which results in arbitrary discrimination of taxable property in the same class, as defined by state law, and thereby taking property without due process of law and failing to give it the equal protection of the law, constitutes a federal question beyond all controversy. [citing cases]
>
> It should be pointed out that this court is inclined to agree with the defendants that industrial property could reasonably be classified separately and assessed under a different method while conforming to the dictates of equal protection of the laws. [citing *Browing*] However, when the Constitution prohibits such a separate classification, and the statutes do not permit it, and the State Tax Commission has allegedly recognized the requirement of equal treatment, it cannot be said that "settled state practice" has established state law of separate classifications.

And see, In re Chicago Rys. Co., 175 F.2d 282 (7th Cir., 1949); Louisville & Nashville R. Co. v. Bosworth, 230 F. 191 (E.D. Ky., 1915) (This case was modified *sub nom.* Louisville & Nashville R. R. Co. v. Greene, 244 U.S. 522, 37 S.Ct. 683, 61 L.Ed. 1291 (1917) which affirmed the lower court's finding that the railroad was entitled to relief, but which reversed on the ground that the railroad might be entitled to greater relief than that granted by the lower court.); and Delaware, Lackawanna and Western R. Co. v. Kingsley, 189 F.Supp. 39 (D.C.N.J., 1960) (distinguishing *Browning* on the ground that the New Jersey Constitution and statutes do not classify property for tax purposes. Of course, neither do the Constitution and statutes of Tennessee, which points up the difficulties of the *Browning* dicta).

The defendants, opposing the relief sought by the plaintiff, contend that the Court may not "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C.A. § 1341.

■ Plaintiff's allegation that state remedies are not plain, speedy or efficient is denied by defendants on the ground that there are at least three ways in which the plaintiff's complaint can be brought before the state courts—in a suit for tax refund after payment, by certiorari to the Davidson County Circuit Court, and by suits in equity to enjoin the assessment as the basis for local taxes. It is clear, however, that even though the plaintiff theoretically could pursue these procedural avenues in the state courts, state law would bar relief to the plaintiff unless the plaintiff could prove that it has been assessed at more than actual cash value, which of course it cannot do. Even if plaintiff were assessed at more than actual cash value, state law would prohibit any reduction in plaintiff's assessment, and would only permit the assessments of all other taxpayers to be increased. Carroll v. Alsup, 107 Tenn. 257, 64 S.W. 193, (1901); McCord v. Nashville, Chattanooga & St. L. Ry., 187 Tenn. 277, 213 S.W.2d 196 (1948); Mayor and Aldermen of the Town of Morristown v. Burke, 207 Tenn. 180, 338 S.W.2d 593 (1960); and Biltmore Hotel Court v. City of Berry Hill, Tenn., 390 S.W.2d 223 (1965). Defendants admitted at the hearing that, unless the Supreme Court of Tennessee were to reconsider its prior holdings, the plaintiff would not be entitled in the state courts to the relief it now seeks. The Supreme Court of the United States has ruled in an analogous situation that a remedy such as that provided in the courts of Tennessee is, in effect, no remedy at all, and is certainly not sufficiently plain, speedy and effi-

cient to bar federal equity relief. Township of Hillsborough, Somerset County, N. J. v. Cromwell, 326 U.S. 620, 624, 66 S.Ct. 445, 90 L.Ed. 358 (1946) (suit for declaratory judgment, but adequacy of state remedies analyzed in terms of suit for an injunction); Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 446, 43 S.Ct. 190, (1923); and Greene v. Louisville & Interurban R. R. Co., 244 U. S. 499, 37 S.Ct. 673, 61 L.Ed. 1280 (1917). Furthermore, in a suit strikingly similar to the present, the Sixth Circuit has affirmed a District Court injunction and has sustained federal equity jurisdiction in order to prevent a multiplicity of suits and in order to remove a cloud from plaintiff's property in Tennessee. Taylor v. Louisville & N. R. Co., 88 F. 350 (6th Cir., 1898). *Taylor* was a diversity case decided before *Erie*, and it may not today be controlling in a suit based solely on diversity, but it is significant to note that the Court at that time held that Tennessee law prohibited classification of property for assessment purposes, a decision contrary to the Supreme Court's intimation in *Browning* that the type of classification involved in this case was never "questioned" before the *Browning* case. As we have seen, that is still the law in Tennessee, and since there is no plain, speedy, and efficient remedy in Tennessee to correct the intentional and systematic violations of either its own law or of the Fourteenth Amendment, federal declaratory and injunctive relief is not only proper but necessary for the protection of plaintiff's constitutional rights. The defendants' abstention argument has been considered by the Court. But in view of the settled state rule, the Court is persuaded that any appeal to the state courts would be in vain.

The Court is aware of the impact of the present decision upon the tax structure of the state and its subdivisions, since the type of discriminatory treatment here involved is deep-seated and of long-standing and many governmental programs have been patterned accordingly. Realizing the possibility that a ruling in its favor could have serious disruptive effects throughout the state, the plaintiff, in open court, offered to accept the assessment of $74,865,850.00, as determined by the State Board of Equalization, less a reduction of 15%, for the current tax biennium, without prejudice to its rights as to future tax years, and without prejudice to its insistence that the discrimination against it is represented by a much higher percentage. The defendants have made no response to this offer. In any event, it does not appear that the Court should undertake to decree or enforce any particular reduction in the plaintiff's assessment or to determine what the assessment should be to eliminate the existing discrimination against the plaintiff. At least in the first instance, this is a task for the State Equalization Board, acting in such a way as to remove from the existing assessment any invidious discrimination, with a minimum of disruption to the revenues of the state and its subdivisions. Wyandotte Chemical Corp. v. City of Wyandotte, 321 F.2d 927, 931 (6th Cir., 1963), quoting from Helmsley v. City of Detroit, Michigan, 320 F.2d 476 (6th Cir., 1963).

■ A form of judgment will be submitted declaring the rights of the plaintiff consistently with this opinion, and enjoining the defendants from certifying or enforcing the challenged assessment of plaintiff's property, without prejudice to the right of the State Board of Equalization to rehear and reconsider the assessment so that it may be made to conform with the requirements of equal protection of the law under the Fourteenth Amendment. Pending such re-determination, the case will be retained on the active docket, with either party having the right to apply to the Court at any time for other or additional orders.

### APPENDIX "A"

*Tennessee Constitution*

The Constitution of the State of Tennessee provides as follows:

All property shall be taxed according to its value, that value to be ascertained in such manner as the Legislature shall direct, so that taxes shall

be equal and uniform throughout the State. No one species of property from which a tax may be collected, shall be taxed higher than any other species of property of the same value, * * *. (Art. 2, § 28)

The General Assembly shall have power to authorize the several counties and incorporated towns in this State, to impose taxes for County and Corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to State taxation. (Art. 2, § 29)

## APPENDIX "B"

### Tennessee Statutes

The Statutes of Tennessee (Tennessee Code Annotated) provide, in part, as follows:

67–605. *Basis of valuation.*—All property of every kind shall be assessed at its actual cash value. The term "actual cash value," is defined to mean the amount of money the property would sell for, if sold at a fair, voluntary sale.

67–608. *Contents of real estate assessments.*—In assessing real estate, the following shall be shown: * * * (3) the actual cash value of the land or lot * * *.

67–623. *Penalty for omission, underassessment or copying from previous assessments.*—It shall be unlawful for any assessor or deputy willfully, knowingly, or negligently to permit or allow any property subject to taxation to be or remain unassessed or omitted from assessment, or willfully, knowingly, or negligently to assess any property at less than its cash value, or to assess any property solely by substitution or copy from former assessment.

67–627. *Assessor's oath.*—Each assessor, when he makes his report of his assessment list to the county court clerk provided in § 67–626, shall accompany the same with the following oath, to be made and subscribed to before the judge or chairman of the county court and filed in the office of the clerk of the county court, viz.: "I, ——— do solemnly swear * * * that I have estimated the value of all taxable property * * * at its actual cash value as prescribed by law * * * so help me God."

67–639. *Deputy's oath.*—Each deputy assessor shall take and file with the county court clerk said oath of office prescribed in § 67–627, upon completion of his duties as assessor.

67–304. *Surety bond.*—Each county assessor shall * * * enter into a bond * * * payable to the state of Tennessee, in the sum of ten thousand dollars ($10,000), * * * conditioned that he will, impartially, honestly, and to the best of his knowledge and ability, assess all taxable properties at their actual cash values * * * and also to be liable for any willful, or negligent failure by which any property subject to taxation shall be or remain unassessed or be assessed at less than its actual cash value.

67–307. *Oath of office.*—Each assessor shall take and subscribe to the following oath of office, * * * "I, . . . do solemnly swear * * * that I will assess all taxable property, real and personal and mixed, at its actual cash value * * *."

67–310. *Oaths of deputies.*—Each deputy assessor shall likewise take his oath and file the same with the county court clerk, before entering upon the discharge of his duties.

67–629. *Penalty for failure to file oaths.*—It is hereby declared unlawful for any assessor or deputy assessor to enter upon or undertake the performance of the duties of an assessor, without first taking the preliminary oath of office prescribed in §§ 67–307 and 67–310 or to fail, neglect, or refuse to take and accompany the said report of his assessment list with the subsequent oath prescribed in §§ 67–627 and 67–628.

**67–210.** *Oath of members of county board.*—Each member of the county board of equalization, before entering upon the discharge of the duties of his office, shall, before the judge or chairman of the county court, take and subscribe to the following oath, to be filed with the clerk of the county court, viz.: * * * "I, * * * hereby solemnly swear (or affirm) that I will * * * equalize, fix, and compute the value of all such properties upon the standard of an actual cash valuation as directed by the laws of the state, by raising the value of all properties assessed at less than the actual cash value of the same to the actual cash value thereof * * * ."

**67–801.** *Duties of county board of equalization.*—* * * Said board shall have the power, and it is hereby made its duty, to increase or lower the entire assessment roll or any assessment contained therein, so as to equalize the assessment of all property contained therein, and make such assessment conform to the actual cash value of the property described in the assessment. If the property described in said assessment lists or any part thereof shall have been assessed at less than the actual cash value thereof, the value of the same shall be increased so as to conform to the actual cash value thereof; * * * it being the intention of this chapter that the county board of equalizers shall equalize and compute the value of all property in the county upon the same rate of valuation, so that all property, real, personal and mixed, shall have uniformity of valuation upon actual cash value.

**67–804.** *Right of complaint—Inquiries by county board.*—Any owner of property liable for taxation in the state shall have the right, in person or by his agent, to make complaint before the county board of equalization that other property or properties in the county have been assessed at less than the actual cash value thereof or at a less percentage of value than complain-

ant's own property. [The board may make such changes] so as to conform throughout the county to a just and equitable standard, which standard in such case shall not be less than the actual cash value of the property.

**67–810.** *Underassessment prohibited.*—It is declared unlawful for any county board of equalization, or any member thereof, willfully, knowingly, or negligently to compute, fix, or equalize, or willfully, knowingly, or negligently to permit or suffer the same to be done, the value of any property at less than its actual cash value.

**67–811.** *Proceedings for penalty against county equalizers.*—If, in equalizing the properties, it shall come to the knowledge of the state board of equalization, or should it have reasonable grounds to believe such is the case, that any county board of equalizers, or any member thereof, has violated § 67–810, it shall be the duty of said state board to immediately notify the commissioner of finance and taxation of the same, and it shall thereupon be the duty of said commissioner to immediately direct an agent of the state, or the district attorney of the district in which the offense is committed, to institute proceedings to recover the penalty prescribed in § 67–1710, which said direction shall be complied with by such district attorney or revenue agent.

**67–812.** *Proceedings against assessors for penalty.*—It shall be the duty of the members of the county board of equalizers, when it is known to or reasonably suspected by any one of them that any assessor or deputy has knowingly, willfully, or negligently assessed any property at less than the actual cash value of same, to report the same to the district attorney or proper officer of the state, whose duty it shall be, upon receiving such information, to institute proceedings against the assessor upon his bond to recover the penalty prescribed in § 67–1710.

**67–818.** *Board's indorsement on assessment rolls.*—Upon returning the

assessment rolls of the county to the county court clerk, the said board of equalizers shall append to or indorse upon the same a certificate signed by each member, viz.: "We * * * have equalized, computed, and fixed the values of all properties set out in the assessment rolls of said county, upon the standard of the actual cash value of the same, by raising the values of all properties assessed at less than the actual cash value thereof to the actual cash value of the same, * * *."

67–821. *Right of complaint to state board of equalization.*—Any taxpayer, or any owner of property subject to taxation in the state, shall have the right to a hearing and determination by the state board of equalization of any complaint he may make on the ground that other property than his own has been assessed at less than the actual cash value thereof, or at a less percentage of value than his own property or other property * * *.

67–822. *Determinations by state board—False statements.*—Said board * * * shall equalize, compute, and fix the value of all such properties within its jurisdiction by the standard of the actual cash value of same, and, for said purposes, said board shall have the power, and it is made its duty to reduce or increase, values of property so that the values of all assessments when so equalized shall conform to said standard of actual cash value.

67–207. *Oath of board members.*—It shall be the duty of the members [of the state board] to * * * subscribe to an oath that they will fairly and impartially perform the duties imposed upon them by this chapter, and equalize, fix, and compute the values of properties within their jurisdiction, so that the value thereof shall conform to the standard of the actual cash value of the same.

67–901. *Assessment by public service commission—Companies included—Situs of motor carriers.*—The Tennessee public service commission, hereinafter called the commission, is authorized and directed to assess for taxation, for state, county and municipal purposes, all of the properties of every description, tangible and intangible, within the state, belonging to the following named persons, hereinafter referred to as companies, namely: (1) railroads; * * *. The commission shall assess all of said property biennially in odd years at its actual cash value * * *.

67–1710. *Penalty for violations by assessors and equalizers.*—Each assessor or deputy assessor or member of the county board of equalizers who violates, neglects, or fails, or refuses to comply with any of the provisions of chapters 2, 3, 6 to 8, inclusive, 10 to 14, inclusive, 16, or 20, of this title, unless the same is otherwise expressly made punishable as a misdemeanor, shall pay and forfeit to the state the sum of not less than fifty dollars ($50.00) nor more than one hundred dollars ($100) for each offense, which penalty shall be recovered of the offender and sureties on his bond, in the case of assessors and deputies, and of the members of the board of equalizers personally, in any court of record in the county or before any justice of the peace of the county, by motion on five (5) days' notice or by suit instituted for the purpose.

67–1711. *Prosecution of offenses.*—It shall be the duty of the district attorneys, upon the information or at the request of any reputable citizen of the state, to investigate and prosecute ex officio all the offenses defined in § 67–1710.

67–1712. *Filing of motion to recover penalty.*—It shall be the duty of each district attorney, county auditor, and county judge or chairman, when it comes to his knowledge, or he has reasonable grounds to believe that the provisions of § 67–1710 have been violated, to institute proceedings by such motion or suit to recover the penalties prescribed.

See also, Code sections 67–814, 67–826, 67–928, 67–1714, and 67–1715.

## APPENDIX "C"

*Tennessee Assessment Ratios*

At the hearing on January 17, 1966, the following documents were introduced into evidence upon the stipulation of the parties:

(1) The Report of the Tennessee Taxpayers Association:

### ACTUAL AND EFFECTIVE 1963 TAX RATES

| County | Actual [1] Tax Rate | Ratio of [2] Assessed to Actual Value | Effective Tax Rate |
|---|---|---|---|
| Anderson | $ 6.36 | 15% | $ .95 |
| Bedford | 3.40 | 20% | .68 |
| Benton | 3.80 | 14% | .53 |
| Bledsoe | 4.35 | 20% | .87 |
| Blount | 3.00 | 20% | .60 |
| Bradley | 5.05 | 12% | .61 |
| Campbell | 10.37 | 10% | 1.04 |
| Cannon | 4.19 | 15% | .63 |
| Carroll | 3.55 | 22% | .78 |
| Carter | 2.35 | 33⅓% | .78 |
| Cheatham | 2.95 | 20% | .59 |
| Chester | 3.75 | 18% | .68 |
| Claiborne | 6.20 | 18% | 1.12 |
| Clay | 3.75 | 14% | .53 |
| Cocke | 5.30 | 15% | .80 |
| Coffee | 5.00 | 22% | 1.10 |
| Crockett | 1.90 | 30% | .57 |
| Cumberland | 5.90 | 16% | .94 |
| Davidson (Metro GSD) | 3.70 | 40% | 1.48 |
| Decatur | 4.30 | 12% | .52 |
| DeKalb | 4.89 | 16% | .78 |
| Dickson | 4.25 | 14% | .60 |
| Dyer | 3.75 | 13% | .49 |
| Fayette | 2.46 | 14% | .34 |
| Fentress | 5.00 | 20% | 1.00 |
| Franklin | 3.20 | 14% | .45 |
| Gibson | 3.10 | 20% | .62 |
| Giles | 3.84 | 25% | .96 |
| Grainger | 3.40 | 20% | .68 |
| Greene | 3.23 | 20% | .65 |
| Grundy | 4.90 | 12% | .59 |
| Hamblen | 3.80 | 16% | .61 |
| Hamilton | 3.10 | 40% | 1.24 |
| Hancock | 4.05 | 16% | .65 |
| Hardeman | 4.00 | 16% | .64 |
| Hardin | 5.00 | 16% | .80 |
| Hawkins | 7.50 | 9% | .68 |

[1] Some counties levy a different rate on the property inside the municipalities.

[2] These ratios apply to local property only.

| County | Actual[1] Tax Rate | Ratio of[2] Assessed to Actual Value | Effective Tax Rate |
|---|---|---|---|
| Haywood | 3.75 | 14% | .53 |
| Henderson | 4.00 | 18% | .72 |
| Henry | $ 3.75 | 22% | $ .83 |
| Hickman | 4.30 | 25% | 1.08 |
| Houston | 4.60 | 18% | .83 |
| Humphreys | 2.80 | 25% | .70 |
| Jackson | 5.40 | 16% | .86 |
| Jefferson | 4.00 | 20% | .80 |
| Johnson | 2.32 | 20% | .46 |
| Knox | 3.54 | 25% | .89 |
| Lake | 3.70 | 25% | .93 |
| Lauderdale | 5.66 | 16% | .91 |
| Lawrence | 3.85 | 18% | .69 |
| Lewis | 3.20 | 18% | .58 |
| Lincoln | 2.98 | 25% | .75 |
| Loudon | 4.90 | 10% | .49 |
| McMinn | 6.00 | 10% | .60 |
| McNairy | 4.60 | 18% | .83 |
| Macon | 3.20 | 20% | .64 |
| Madison | 3.66 | 25% | .92 |
| Marion | 4.65 | 22% | 1.02 |
| Marshall | 4.00 | 20% | .80 |
| Maury | 2.84 | 25% | .71 |
| Meigs | 2.55 | 40% | 1.02 |
| Monroe | 4.25 | 16% | .68 |
| Montgomery | 3.50 | 16% | .56 |
| Moore | 2.65 | 22% | .58 |
| Morgan | 5.45 | 16% | .87 |
| Obion | 3.13 | 18% | .56 |
| Overton | 4.25 | 16% | .68 |
| Perry | 3.45 | 18% | .62 |
| Pickett | 3.40 | 25% | .85 |
| Polk | 5.50 | 25% | 1.38 |
| Putnam | 2.75 | 20% | .55 |
| Rhea | 5.83 | 14% | .82 |
| Roane | 5.30 | 18% | .95 |
| Robertson | 3.10 | 25% | .78 |
| Rutherford | 2.86 | 20% | .57 |
| Scott | 8.00 | 7% | .56 |
| Sequatchie | 4.85 | 18% | .87 |
| Sevier | 3.96 | 10% | .40 |
| Shelby | 2.21 | 50% | ·1.11 |
| Smith | 3.75 | 25% | .94 |
| Stewart | 4.55 | 14% | .64 |
| Sullivan | 3.75 | 20% | .75 |
| Sumner | 3.48 | 15% | .52 |
| Tipton | 3.90 | 16% | .62 |

[1] Some counties levy a different rate on the property inside the municipalities.

[2] These ratios apply to local property only.

| County | Actual[1] Tax Rate | Ratio of[2] Assessed to Actual Value | Effective Tax Rate |
|---|---|---|---|
| Trousdale | 3.25 | 25% | .81 |
| Unicoi | 4.68 | 14% | .66 |
| Union | $ 4.20 | 12% | $ .50 |
| Van Buren | 3.00 | 20% | .60 |
| Warren | 5.70 | 10% | .57 |
| Washington | 4.97 | 16% | .80 |
| Wayne | 4.00 | 14% | .56 |
| Weakley | 3.65 | 18% | .66 |
| White | 3.79 | 18% | .68 |
| Williamson | 3.55 | 26⅔% | .95 |
| Wilson | 2.50 | 30% | .75 |
| Median | $ 3.80 | 30%[3] | $ .68 |

[1]  Some counties levy a different rate on the property inside the municipalities.

[2]  These ratios apply to local property only.

[3]  Average

———◆———

(2) The transcript of the hearing before the State Board of Equalizers. At pages 52–53 of the transcript, the Chairman stipulated that the above report of the Tennessee Taxpayers Association would "fairly represent" the ratio of local assessments to actual cash value for the 1965–1966 biennium. At page 7 of the transcript, the Chairman made the following statement:

I think that the Board  *  *  * takes judicial notice of the fact  *  * that there is a wide variance of assessments in the various counties and cities of the state, which range from somewhere in the neighborhood of six percent to fifty percent of actual value, in the assessment of local property. Not insofar as the Commission's assessments are concerned. The Board knows that as a matter of fact, and I think would have a right to take judicial knowledge of that fact.

At pages 45–46 of the transcript is printed an excerpt from the "Financial Report of the Legislative Council Committee of the Seventy-ninth General Assembly, State of Tennessee, to the General Assembly of the Governor and Members," which reads as follows:

Average assessment levels in the twenty-one counties studied varied from eleven percent of actual value to forty-nine percent of actual value. In no county did the average level even approach the one hundred percent standard established by law.

Also at page 46 of the transcript is an excerpt from the "Final Report, Tax Assessment Study, 1962," which summarizes the testimony before the Legislative Council Committee as follows :

This testimony is a positive indictment of the present administration of our property tax laws. The Tennessee Taxpayers report on County and City government for the year 1961 shows that only one county of the State has a ratio of assessment to actual value as high as fifty percent, with only two more counties as high as forty percent.

This same report shows fifty-three counties with an assessment ratio of less than twenty percent. In other words, the present statutory requirement of assessment at the actual

cash value is not observed by any county assessor.

Finally, page 47 of the transcript contains a reference to a census report prepared by the United States Department of Commerce which shows an average ratio between assessed and actual value in Tennessee of 28.4%.