337 So.2d 1081 (1976)
Cliff PROBST
v.
The CITY OF NEW ORLEANS et al.
Harry B. SCHMIDT, Jr.
v.
The CITY OF NEW ORLEANS et al.
WALGREEN LOUISIANA COMPANY, INC., et al.
v.
The CITY OF NEW ORLEANS et al.
Nos. 57594, 57595, 57602, 57603 and 57618.
Supreme Court of Louisiana.
September 13, 1976.
Rehearing Denied October 13, 1976.
*1082 Nathan, T. Gisclair, Jr., Montgomery, Barnett, Brown & Read, New Orleans, for plaintiffs-applicants in 57594 and 57595.
Philip S. Brooks, City Atty., Lee R. Miller, Jr., Philip D. Lorio, III, Asst. City Attys., for defendants-applicants in 57594 and 57595.
Nathan T. Gisclair, Jr., Montgomery, Barnett, Brown & Read, New Orleans, for plaintiffs-respondents in 57595 and 57602.
William J. Guste, Jr., Atty. Gen., Warren E. Mouledoux, First Asst. Atty. Gen., Robert L. Danner, Jr., Asst. Atty. Gen., for defendants-applicants in 57602 and 57603.
Philip S. Brooks, City Atty., Lee R. Miller, Jr., Philip D. Lorio, III, Asst. City Attys., Richard J. McGinity, Orleans Levee Bd., New Orleans, for defendants-applicants in 57603.
Arthur L. Ballin, Frank C. Dudenhefer, New Orleans, for defendants-respondents in 57603.
DIXON, Justice.
Plaintiffs in these cases, having paid ad valorem taxes under protest, brought these suits to contest the increased assessments. There was judgment for defendants in the district court. The Court of Appeal reversed, holding that the revaluation of the property violated constitutional guarantees of equal protection and uniformity, because the revaluation was accomplished without a systematic plan to equalize taxes by revaluing properties throughout New Orleans. Probst v. The City of New Orleans et al., La.App., 325 So.2d 665; Schmidt v. The City of New Orleans et al., La.App., 325 So.2d 671; Walgreen Louisiana Co., Inc. v. The City of New Orleans et al., La.App., 325 So.2d 673 (1976). We granted writs to consider the rulings in these cases.
All cases involve commercial property within the central business district of New Orleans. The Probst and Schmidt cases involve improved and unimproved parcels within the First Municipal Assessment District, Parish of Orleans, and were consolidated for trial. In the Walgreen case several plaintiff owners or lessees of parcels lying in the central business district within the Second Municipal Assessment District joined in one suit. Probst and Schmidt paid 1973 taxes under protest; the Walgreen plaintiffs contest the 1974 and 1975 assessment. The cases were tried in 1975.
Plaintiffs contend that they and other property owners in the central business district suffered from arbitrary and discriminatory selection for increased evaluations, and that the increased assessments were illegally adopted.
Unlike other parishes, Orleans is divided into seven assessorial districts with an elected assessor for each. R.S. 47:1901. Each is required to "independently exercise his functions in the assessing and listing of the property in and for his respective district. . ." R.S. 47:1909. Assessments are subject to review by a board consisting of the Mayor of New Orleans as chairman, members of the City Council, a member of the Board of Liquidation, a member of the Sewerage and Water Board, the President of the Board of Levee Commissioners and the President of the Orleans Parish School Board. The Board of Reviewers "shall recommend to the tax commission increases or decreases in any assessment of real or personal property made by the various assessors of the parish of Orleans in accordance with the true conditions found by it." R.S. 47:1995. Tax rolls are forwarded to the Louisiana Tax Commission (see former Art. X, § 12, La.Const.1921, repealed, Act 789 of *1083 1972, approved Nov. 1972), whose duty it is to fix the value of all taxable property. R.S. 47:1989; Bussie v. Long, 257 La. 623, 243 So.2d 776 (1971); Bussie v. Long, La. App., 286 So.2d 689 (1973), writ denied La., 288 So.2d 354 (1974). The "lawful authorities of each parish" are permitted to fix valuations at less than actual cash valuations by using a percentage of the actual cash value fixed by the Tax Commission, provided that "for local purposes the percentage shall operate equally and uniformly on all taxable property within the parish or other local subdivision . . ." R.S. 47:1989. (Art. X, § 1, La.Const.1921 provides that "the taxing authorities of the local subdivision may adopt a different percentage. . ."
In 1971 the Board of Reviewers formed an advisory committee to develop methods of equalizing assessments throughout the city. No formal plan was adopted for revaluation of all property in the city, but it was decided to do as much as possible in 1972. Assessor Smith of the Fifth Municipal District agreed to revalue the vacant land in the Algiers "lower coast." A decision was reached to attempt revaluation on land only, because of the difficulties in appraising buildings. A well-defined geographical area (referred to as the Central Business District or CBD throughout the records in both cases) was selected as the first to be revalued by a team of real estate appraisers to be appointed by the Real Estate Board under a contract with the city. The boundaries of the CBD were to be Iberville Street, the Mississippi River, Gaiennie Street, the Pontchartrain Expressway and South Claiborne Avenue. All except a strip one block wide from the river to Claiborne lying between Canal and Iberville Streets lay within the First Municipal District, and from the River to Rampart Street was bounded by the Vieux Carre. The staff of the Board of Reviewers depended heavily on the cooperation of the individual assessors, and when the assessor of the Second District objected to the project, the revaluation of the Iberville strip was postponed for a year.
The revaluation procedures adopted by the appraisers varied slightly from an individual appraisal of each parcel of land. Using available comparable sales, the appraisers established a square foot value for each block on each street in the CBD. An average sized, regular shaped parcel which fronted on only one street was valued by multiplying its area in square feet times the square foot value applicable to that block. Others parcelsirregular in shape, unusual in size, fronting on more than one street and the likewere subject to adjustments by the appraisers beyond the simple application of area to square foot value.
No complaint is made in either of these suits that any assessment is based on an appraisal in excess of market value, or that the appraisals lacked such a uniform relationship to actual value that they were, for that reason, discriminatory. In the First Municipal District approximately eight hundred assessments were increased; about one hundred fifty were reduced; some stayed the same. In the Second Municipal District there were one hundred sixty-nine increases; eighty decreases and ten were the same.
In September of 1972 six resolutions were unanimously adopted by the Board of Reviewers concerning the revaluation. One was a policy resolution, expressing the purpose of the Board of Reviewers to equalize assessments in the CBD, and to fix the percentage of value on which each parcel would be assessed to be that which would produce approximately the same total amount of assessments as before equalization (except for improvements and additions). If more than a 3% increase in total assessments resulted from revaluation, the board resolved to reduce the assessments the following year, and the equalized assessments would not be increased for five years. A separate resolution fixed the assessment in the CBD at 33 1/3% of market land value. (Before 1972 commercial property in the CBD had been assessed as high as 40% of value in the First District; in the Second District the assessor stated that he listed the property at 25% of its value *1084 throughout the district). Other resolutions pertained to: relief for taxpayers whose land was burdened with a lease not reflecting present values; credit for "Historic and Green Area" tracts; relief for hardship cases and funding the revaluation.
In due course the Louisiana Tax Commission approved the recommendations of the Board of Reviewers and revalued the land in the CBD lying in the First District for 1973 taxes, and for the Iberville strip of the CBD in the Second District for 1974 taxes.
In 1974 the appraisers for the Board of Reviewers appraised land in the New Orleans East area in the Third Municipal District. Land only was revalued, even though some property had been improved. The percentage of actual value recommended by the Board of Reviewers was not accepted by the Louisiana Tax Commission, which raised the percentage from ten to twenty, the same percentage applied to the lower coast of Algiers in 1972 by the assessor in the Fifth District. Public utilities property was also reviewed and reassessed in 1974.
By the end of 1974 the Board of Reviewers had adopted a program for revaluation of all lands in the City of New Orleans. All assessments on vacant property in Orleans Parish were to be equalized in 1975. In 1976 assessments for land zoned for various industrial uses were to be equalized, to be followed in 1977 for land zoned for commercial uses, for shopping centers, neighborhood businesses, medical services and general office districts. Revaluation and equalization were to be completed in 1978, including land and improvements, residential areas and specially zoned historic districts.
The procedures and plans of the Board of Reviewers were in sharp contrast to the practices of the assessors prior to 1972 disclosed by the record. In the absence of complaints, once property was assessed, its assessment went unchanged except when property was sold, improved or demolished.
Plaintiffs argue that their increased assessments resulted from the violation of both constitutional principles and statutory provisions. The only attack on the revaluation itself seems to be that it was not done on a parishwide nor even a districtwide basis. Revaluation and reassessment in a good faith effort to achieve uniformity and equality in a given district need not be delayed until the entire district can be revalued at the same time. Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154 (1918); Annotation TaxIncomplete Equalization Program, 76 A.L.R.2d 1077 (1961); May Department Stores Co. v. State Tax Commission, 308 S.W.2d 748 (Mo.1955); Morrison v. Rutherford, 83 Wash.2d 153, 516 P.2d 1036 (1973). If only a part of a taxing district can be revalued in one taxing year, because of limitations of manpower and funds on those charged with assessing, a program of revaluation may start in a reasonably determined portion of the district, even though property in that part might bear a larger portion of the tax burden for a reasonable time until all property is revalued.
The central business district was the natural place to start. It contained the Superdome and other dramatic developments on Poydras Street, where property values increased greatly. If a developer contemplated buying land, he would be faced with taxation based on the sale price, with the prospect of competition from owners who were taxed on outdated land values. Although commercial, business and industrial sites are located from place to place throughout the city, there is no other area which is comparable to the size and concentration of commercial properties in the CBD. The district is surrounded by identifiable boundaries, natural, man-made and legalthe Mississippi River, the Pontchartrain Expressway elevated approach to the Mississippi River Bridge, the elevated through-the-city route of Interstate Highway 10 above the right-of-way of Claiborne Avenue and the Vieux Carre reaching from the river to Rampart and Iberville. The Vieux Carre is a constitutionally protected preservation area in which property may be exempted from taxation and in which building alteration and demolition are prohibited without approval *1085 of the Vieux Carre Commission. Art. XIV, § 22A, La.Const.1921.
The selection of the CBD as the area for beginning a revaluation and equalization program is supported by strong reasons and cannot be characterized as arbitrary or unreasonably discriminatory.
The attack is concentrated on the percentage (33 1/3%) of actual value which forms the assessment on which the tax is levied. The complaint is that other "commercial" property in the same assessorial district is taxed at a smaller percentage of the assessed value.
The record in the Probst and Schmidt cases establishes that commercial property in the First Municipal District in the area covered by the CBD was assessed at 30% to 40% of the supposed value before the revaluation in 1972. In that district the assessor used four classifications to which he applied a rather flexible percentage to obtain an assessment. The only property discussed in the CBD was "commercial." Outside the CBD residential property was assessed at from 15% to 17%. The only real commercial area in the district, according to the assessor, was in the CBD, except for scattered spots and nonconforming uses, which were assessed at 25% to 30% of value. Light and heavy industrial were also assessed at about 25% to 30%.
In the Second Municipal District (the Walgreen case), property was assessed at 25% of value, except for the strip in the CBD lying between Canal and Iberville from the river to Claiborne.
Art. X, § 1, La.Const.1921, in effect at the time of the assessments complained of, provides:
"The power of taxation shall be vested in the Legislature; shall never be surrendered, suspended or contracted away; and all taxes shall be uniform upon the same class of subjects throughout the territorial limits of the authority levying the tax, and shall be levied and collected for public purposes only. No property shall be assessed for more than its actual cash value, ascertained as directed by law, and all tax-payers shall have the right of testing the correctness of their assessments before the courts at the domicile of the assessing authority, or as may be directed by law. The valuation and classification fixed for State purposes shall be the valuation and classification for local purposes; but the taxing authorities of the local subdivision may adopt a different percentage of such valuation for purposes of local taxation."
Bussie v. Long, La.App., 286 So.2d 689 (1973), relied on well established constitutional principles:
"It is settled that a taxpayer is entitled to have his property taxed at that percentage of value applicable to others equally and similarly situated, even though statutory law may provide otherwise. The rule is based on the principle that if both the standard of true value and the uniformity and equality required by law cannot be achieved, equality and uniformity is preferred under the law. Sioux City Bridge Co. v. Dakota County, Neb., 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340, 28 A.L.R. 979.
"The equal protection clause of the Fourteenth Amendment to the United States Constitution protects a taxpayer from any state action which discriminates against him by subjecting his property to taxes not imposed on others in the same class. The right thus protected is the privilege of receiving equal treatment under law.
"Although states have wide discretion in the area of taxation, such discretion may not be exercised so as to arbitrarily deprive taxpayers of constitutional rights. While the Fourteenth Amendment does not require exact uniformity and equality in matters of taxation. It does protect against intentional and arbitrary discrimination whether resulting from the express terms of a statute or its improper execution by those charged with its enforcement. Weissinger v. Boswell, D.C., 330 F.Supp. 615.
"A state may establish reasonable classifications for the taxing of property at different rates. However, if state law *1086 requires that all property be taxed at a uniform rate and has enacted laws to insure such result, any substantial disparity or difference in taxes arising from failure of state officers to properly administer the laws will be held in violation of the due process and equal protection clauses of the United States Constitution. Weissinger, above. To the same effect, see Louisville & Nashville R. Co. v. Public Serv. Comm. of Tenn., D.C., 249 F.Supp. 894." 286 So.2d 689, 700-701.
Although at the time of the trial of these cases in 1975 no effort had been made to revalue and assess commercial property in New Orleans outside the CBD, we do not find support in the record for plaintiffs' contention that their property had been singled out for the application of a higher tax ratio than other similarly situated properties. We find no evidence that it was the intention of the Board of Reviewers or the City Council or the Louisiana Tax Commission to apply a higher percentage to the value of CBD property than to similar commercial property outside the CBD when the revaluation was completed.
As mentioned before the intention of the Board of Reviewers in 1971 was to develop methods of revaluation of property in the whole city. That their intention was equalization and not discrimination is evidenced by their resolutions in September of 1972, expressing the policy to equalize and not increase total assessments in the CBD. It is true that the authorities proceeded in a step-by-step manner, without the formal adoption of a citywide plan until the end of 1974. That plan contemplated the equalization of assessments on all business and commercial property in the city in 1977.
There is no evidence that a percentage of value would be used in 1977 for the assessment of commercial and business property different from that used for the assessment of property in the CBD.
Plaintiffs argue that the taxing authorities could not legally assess commercial property at a percentage of value higher than other kinds of property in the city, relying on the absence of specific statutory authority and certain action of the legislature in 1972, as well as the failure of constitutional amendment in 1972 which would have permitted the creation of a Central Business District in New Orleans as a separately assessed and taxed public improvement district.
We find it irrelevant that the constitutional amendment was defeated; it had no relationship to equalization of assessment in New Orleans. Nor does the repeal in 1972 of R.S. 47:1988 support the inference that classification of different kinds of property for the purpose of assessment was illegal. The repealing act (Act 13, § 1 of Ex.Sess. of 1972) was part of a legislative package designed to remove the State from ad valorem property taxing activity (see Art. 10-A, La. Const.1921). R.S. 47:1988, among other things, specifically permitted the tax commission to classify and subdivide the classifications of different kinds of property. The amendment and reenactment of R.S. 47:1989 by Act 14, § 1 of Ex.Sess. of 1972 continued the statutory power of the "lawful authorities" of parishes to fix percentages of valuations of properties for assessment purposes. The language of the old statute was retained, eliminating only the prohibition against fixing valuations by parish authorities at less than 25% of the actual cash valuation fixed by the Tax Commission. (R.S. 47:1997, not amended in 1972, but amended in respects not relevant in 1974, continues to permit the City Council to adopt a different percentage of value from that adopted by the Tax Commission, in which case the percentage adopted cannot be less than 25% of actual cash value fixed by the Commission.
The 1972 legislation was a reaction to demands for equalization of property taxes in Louisiana. Classifications of kinds of property for taxation was so widespread (see Bussie v. Long, supra) that we cannot assume the legislature was unaware of the practice. The unchanged continuation of the power of the Tax Commission to "change or correct" assessments (R.S. 47:1990), the continuation of the Board of Reviewers of Orleans Parish (R.S. 47:1931) *1087 and the continuation of the powers of the "lawful authorities" to levy, assess and collect taxes on "less than actual cash valuation" and fix percentages (R.S. 47:1989), reinforce the view that the failure to prohibit classification of different kinds of property left the power of the "lawful authorities" to classify after 1972 as it had been before 1972limited only by the "essential principle of practical uniformity." Sunday Lake Iron Co. v. Wakefield, supra.
Caddo Parish Police Jury v. Lancaster, La.App., 232 So.2d 781 (1970), does not support plaintiffs' position. There, the police jury desired to use one percentage of value for the levy of a 3/10 mill and a 1/10 mill tax for the juvenile court, and another percentage for the other taxes levied by the parish. The court held that the same percentage must be applied for all taxes levied. Whether different percentages could be used for different classes of property was not an issue in the case.
In summary, there has been substantial compliance with relevant statutory requirements, and no violation of due process or equal protection clauses of the United States Constitution. See Louisiana & Arkansas Ry. Co. v. Goslin, La., 300 So.2d 483 (1974).
For these reasons the judgment of the Court of Appeal is reversed, and the judgment of the district court is reinstated, at plaintiffs' costs.
SANDERS, C.J., and SUMMERS, J., dissent, being of the opinion that the judgment of the Court of Appeal is correct. See La.App., 325 So.2d 665-673.
MARCUS, J., dissents.