IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 30, 2001 Session

## IN THE MATTER OF: ALL ASSESSMENTS, REVIEW OF *AD VALOREM* ASSESSMENTS OF PUBLIC UTILITY COMPANIES FOR TAX YEAR 1999

## IN THE MATTER OF: ALL ASSESSMENTS, REVIEW OF *AD VALOREM* ASSESSMENTS OF PUBLIC UTILITY COMPANIES FOR TAX YEAR 2000

**Appeal from the Tennessee State Board of Equalization**
**No.  None**

---

**Nos. M2000-00399-COA-R12-CV & M2000-03117-COA-R12-CV** - Filed September 14, 2001

---

In these consolidated cases, a consortium of counties and cities appeals the actions of the Tennessee State Board of Equalization in reducing public utility assessments by fifteen per cent. Acknowledging that all sub-constitutional issues involved in the cases have been foreclosed by the decision of the Tennessee Supreme Court in *In Re: All Assessments 1998*, No. M1998-00243-SC-R11-CV, 2000 WL 1710174 (Tenn. Nov. 16, 2000), Appellants challenge the constitutionality of Tennessee Code Annotated section 67-5-903(f) and section 67-5-1302(b)(1).  We hold both sections of the Code to be constitutional and affirm the decision of the Tennessee State Board of Equalization.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Tennessee State Board of Equalization Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S. and WILLIAM C. KOCH, JR., J., joined.

Jean Dyer Harrison, Nashville, Tennessee, for the appellants, Tennessee County Government and Tennessee City Governments.

Jeffrey Dean Moseley, Franklin, Tennessee, for the appellant, Williamson County, Tennessee.

Robert B. Rolwing and Donnie E. Wilson, Memphis, Tennessee, for the appellant, Shelby County, Tennessee.

James Charles, Paul D. Krivacka, Jennifer Clinard Surber and Karl Dean, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville and Davidson County.

Jeffrey Dean Moseley, Franklin, Tennessee, for the appellant, Williamson County Government.

Robert B. Rolwing, Memphis, Tennessee, for the appellant, Shelby County Government.

Paul Stuart Parker and Kemper Harlan Dodson, III, Nashville, Tennessee, for the appellee, ANR Pipeline.

Everett B. Gibson, Memphis, Tennessee, for the appellees, Colonial Pipeline Co., MCI Telecommunications, MCI Metro Access Transmission Services, Inc., and Norfolk Southern Railway Co.

Thomas Arthur Scott and Suzanne S. Cook, Kingsport, Tennessee, for the appellees, Kingsport Power Co. and Appalachian Power Co.

Brigid M. Carpenter, Nashville, Tennessee, James W. McBride, Washington, D.C., and Stephen Door Goodwin, Memphis, Tennessee, for the appellee, Coalition of Public Utilities.

Paul G. Summers, Attorney General & Reporter; and Jimmy G. Creecy, Chief Special Counsel, Nashville, Tennessee, for the appellee, Tennessee State Board of Equalization.

Richard W. Bell, Atlanta, Georgia, for the appellee, BellSouth Corporation.

## OPINION

These consolidated cases are "sister" cases to:

1. *In the Matter of: All Assessments,* No. M1998-00243-SC-R11-CV, Review of *Ad Valorem* Assessments of Public Utility Companies for Tax Year 1998.

2. *Williamson County v. Tennessee State Board of Equalization*, No. M2000-03178-COA-R3-CV (review of all commercial and industrial tangible personal property assessments, tax years 1998 and 1999).

Case number M1998-00243-SC-R11-CV, regarding *Ad Valorem* Assessments of Public Utility Companies for the tax year 1998, has already been decided by the Supreme Court of Tennessee on November 16, 2000 in an opinion not yet reported. *In Re All Assessments 1998*, No. M1998-00243-SC-R11-CV, 2000 WL 1710174 (Tenn. Nov. 16, 2000). Case number M2000-03178-COA-R3-CV, involving commercial and industrial tangible personal property assessments for tax years 1998 and 1999, decided by the Chancery Court of Davidson County, has been briefed and

argued in this Court and is now under advisement. *Williamson County v. Tennessee State Bd. of Equalization*, No. M2000-03178-COA-R3-CV (Tenn. Ct. App. filed Oct. 26, 2000)

While the opinion of this Court relative to public utility assessments for tax year 1998 was reversed by the supreme court in *In Re All Assessments 1998*, the opinion, authored by Judge Crawford for this Court on August 20, 1999, contains an accurate and useful overview of taxing procedures which is helpful in the consideration of these consolidated cases.

> The authority to tax property is established by Article II, Section 28 of the Tennessee Constitution. For purposes of taxation, Article II, Section 28 classifies all property into three classes: real property, tangible personal property, and intangible personal property.[1] As pertinent to the case before us, Article II, Section 28 further provides:
>
> > Tangible Personal Property shall be classified into three (3) subclassifications and assessed as follows:
> > (a) Public Utility Property, to be assessed at fifty-five (55%) percent of its value;
> > (b) Industrial and Commercial Property, to be assessed at thirty (30%) percent of its value; and
> > (c) All other Tangible Personal Property, to be assessed at five (5%) percent of its value. . . .
>
> > \* \* \*
>
> > The ratio of assessment to value of property in each class or subclass shall be equal and uniform throughout the State, the value and definition of property in each class or subclass to be ascertained in such manner as the Legislature shall direct. Each respective taxing authority shall apply the same tax rate to all property within its jurisdiction.
>
> The procedure for valuing and assessing property for tax purposes is provided in T.C.A. § 67-5-101 *et seq.* (1998). Most commercial, industrial, and residential property is valued and assessed locally by county assessors. T.C.A. §§ 67-5-102, 103. Assessments of personal property are made annually primarily on the basis of information supplied by the property owner in schedules filed with the assessor. T.C.A. §§ 67-5-902, 903. Under T.C.A. § 67-5-903(f), fixed rates of allowable depreciation costs are established for valuing the nine categories of locally assessed business and industrial personal property.[2]

-3-

With regard to public utility and common carrier property, the property is centrally assessed annually by the comptroller of the treasury. T.C.A. § 67-5-1301.[3] The comptroller must complete the assessments and send notice to the property owner by the first Monday in August. T.C.A. § 67-5-1327(a). Thereafter, the property owner or any taxing authority may file exceptions to the assessment, and the assessments will be acted upon by the comptroller within the time prescribed. T.C.A. § 67-5-1327(b). By the first Monday in September, the comptroller must file the assessments with the State Board of Equalization. The comptroller is also required to notify any person or entity that filed an exception of the action taken on the exception. Within the time prescribed, such person or entity may file further exceptions with the Board. T.C.A. § 67-5-1327(c).

The Board then reviews the assessments as authorized and directed by the provisions of T.C.A. § 67-5-1328. On or before the third Monday in October, the Board is required to certify to the comptroller of the treasury "the valuation fixed by it upon each property assessed." T.C.A. § 67-5-1329. The comptroller is then required to certify to the counties and municipalities the valuation from the Board which is the amount to be taxed in the respective taxing jurisdictions. T.C.A. § 67-5-1331.

_____
[1] Real property is divided into four subclassifications with varying assessment percentages. As for intangible property, the legislature is given the authority to establish classifications and assessment percentages for such.

[2] T.C.A. § 67-5-903 is not applicable to public utilities since public utility personal property is valued and assessed by the comptroller of the treasury. T.C.A. §§ 67-5-1301, 1303, 1314.

[3] The property owner is required to annually file "under oath, schedules and statements giving [information as prescribed in statute] concerning all properties owned or leased by such owners." T.C.A. § 67-5-1303. The comptroller makes the assessment as provided in T.C.A. § 67-5-1302.

*In Re All Assessments 1998*; No. 01A01-9812-BC-00642, 1999 WL 632824, at * 1-2 (Tenn. Ct. App. Aug. 20, 1999), *rev'd*, 2000 WL 1710174 (Tenn. Nov. 16, 2000).

These consolidated cases and the two "sister" cases are so interrelated that proper chronology is essential. The first of the cases involves Public Utility *Ad Valorem* Assessments for the Tax Year

1998, which was decided by the Court of Appeals on August 20, 1999 with the judgment of the Court of Appeals being reversed by the Supreme Court on November 16, 2000. *See In Re All Assessments*, 2000 WL 1710174. That case involved judicial review, under Tennessee Code Annotated section 4-5-322 and Tennessee Rule of Appellate Procedure 12(I), of an October 15, 1998 order of the Tennessee State Board of Equalization overruling exceptions by the Metropolitan Government of Nashville and Davidson County, Williamson County and Shelby County. This order provided in part:

> With regard to equalization, the Board finds that settlements of past claims oblige the Board to grant the 15% personalty equalization adjustment recognized for tax year 1997, to most public utility taxpayers for 1998. The remaining minority of taxpayers, not directly party to these settlements, should be extended the same relief for the equitable considerations we cited in 1997. This adjustment is mandated under the settlements so long as there are no legislative amendments to the local business personalty depreciation statute (Tenn. Code Ann. § 67-5-903), or judicial or administrative findings regarding the statutes that are inconsistent with the rationale of the adjustment. Although an administrative proceeding is pending which will consider the effects of § 67-5-903, disposition is not near enough to warrant a lengthy delay in certifying the 1998 public utility assessments.[1]

*In Re All Assessments 1998*, 1999 WL 632824, at * 3.

The Court of Appeals, in its August 20, 1999 opinion, *In Re All Assessments 1998*, reversed the October 15, 1998 Board of Equalization Order allowing a 15% reduction in the valuations of public utility property. The court held in part: "We simply find no authorization for the Board to reduce the valuation of taxable property below the fair market value of the property absent legislative authorization to do so. We have found no legislative authorization." *Id.* at * 9.

In the argument of the consolidated cases at bar on January 30, 2001, all parties agreed that the *In Re All Assessments 1998* opinion of the Supreme Court on November 16, 2000 was dispositive of all issues presented in these cases except for questions involving the constitutionality of section 67-5-903 and section 67-5-1302(b) of the Tennessee Code.

---

[1] The "administrative proceeding" referred to was a declaratory proceeding pursuant to Title 67 of Tennessee Code Annotated to determine whether or not the depreciation schedules forming a part of Tennessee Code Annotated section 67-5-903 resulted in locally assessed commercial and industrial personal property being valued at less than 100% of its full market value. This proceeding was required in a settlement agreement entered into between BellSouth Telecommunications, Inc., the Metropolitan Government of Nashville and Davidson County, the City of Chattanooga, Hamilton County, Shelby County and Williamson County, along with the Comptroller of the Treasury of Tennessee, the Tennessee Municipal League and the Tennessee County Services Association. This settlement agreement was entered into in February 1998.

It suffices to say that the Supreme Court, in *In Re All Assessments 1998*, assumed the constitutionality of both Tennessee Code Annotated sections 67-5-903 and 67-5-1302(b) and believed that the statutory scheme evidenced by Title 67 Chapter 5 of the Code provided authority to the Tennessee Board of Equalization to take the action evidenced by its October 15, 1998 order. Said the Supreme Court: "The Tennessee Board of Equalization is authorized to reduce (or increase) the appraised (and therefore corresponding assessed) value of centrally-assessed public utility tangible personal property as part of the equalization process, the purpose of which is to equalize the ratio of the appraised value to fair market value of public utility property in any particular county with the corresponding ratio for industrial and commercial property in that county." *In Re All Assessments 1998*, 2000 WL 1710174, at * 7.

In the wake of this background, we address the constitutional issues presented in the consolidated cases at bar.

Intervening between the October 15, 1998 order of the Board of Equalization, which provided the basis for the appeal of the 1998 Public Utility Assessments resulting in the Supreme Court's *In Re All Assessments 1998* decision, and the order of the Board of Equalization of February 10, 2000 was the November 3, 1999 Initial Order of Administrative Law Judge William B. Hubbard issued in the "administrative proceeding" pending at the time of the October 15, 1998 order of the Board of Equalization in the tax year 1998 Public Utility Assessment case. Judge Hubbard's order provided in part:

> This is a declaratory proceeding convened by the Board of Equalization (Board) for the purpose of determining whether the application of certain depreciation schedules found in T.C.A. § 67-5-903 results in undervaluing property for the purpose of ad valorem taxes. The schedules addressed in this proceeding are Group 1, Furniture, Fixtures, General Equipment and All Other Property Not Listed in Another Group; and Group 5, Manufacturing Machinery. The statute provides for these two Groups to be depreciated over eight years with a residual of 20% of original cost.
>
> . . . .
>
> "Value" is defined as ". . . the evidences of its sound, intrinsic and immediate value, for purposes of sale between a willing seller and a willing buyer without consideration of speculative values. . . ." T.C.A. § 67-5-601(a).
>
> Tennessee appraises property on a mass appraisal basis. The generally accepted methodology for a mass appraisal is to obtain the original cost; apply a trend factor to the original cost, thus arriving at "current cost new;" and then depreciate the current cost new by a factor which embraces all forms of normal obsolescence.
>
> . . . .

-6-

Determining value by mass appraisal produces an inexact result. This is particularly exacerbated where, as in Tennessee, property having wide variances between their useful lives are grouped together.

. . . .

The administrative judge finds that the application of the Tennessee statute results in the under valuation of Group 1 and Group 5 properties. Group 1 should have a depreciation schedule of 10 years and Group 5 should have a depreciation schedule of 11 years. Group 1 is undervalued by 11.6% and Group 5 is undervalued by 16.6%.[2]

*In Re All Assessments 1998*, (Tenn. State Bd. of Equ. Nov. 3, 1999) (Initial Order).

Following final review of assessments pursuant to Tennessee Code Annotated section 67-5-1328 for the tax year 1999, the Tennessee State Board of Equalization issued its "Order on Objections to Tangible Personal Property Equalization." This order, entered on February 10, 2000, is the order from which direct appeal was taken to this Court pursuant to Tennessee Code Annotated section 4-5-322 and Tennessee Rule of Appellate Procedure 12(I). This February 10, 2000 order provided:

In this matter the Board is reviewing objections filed by Tennessee counties to certain equalization actions proposed with respect to 1999 assessments of public utility companies. These are the same actions taken by the Board for tax years 1997 and 1998, to wit, a 15% reduction in the tangible personal property portion of the utility assessments, to equalize those assessments to the perceived level of locally assessed commercial and industrial tangible personal property. The latter property is valued by a mass appraisal method that employs standard useful lives for depreciation set forth in Tenn. Code Ann. § 67-5-903, and it is alleged that this method tends to undervalue locally assessed personalty.

_____

[2] While the 1998 Public Utility Assessment's case was before the Supreme Court, the counties and cities sought, pursuant to Tennessee Rule of Appellate Procedure 14, to have the Supreme Court consider the November 3, 1999 initial order of Judge Hubbard as post-judgment facts. By order of December 27, 1999, the Supreme Court refused to do so holding:

> The only issue considered by the Court of Appeals was whether the Tennessee State Board of Equalization erred and/or exceeded its authority when it granted a 15% reduction in the assessed value of certain centrally-assessed public utility tangible personal property. The only issue before this Court is whether the Court of Appeals erred in determining the State Board of Equalization exceeded its authority. . . . Although the Court of Appeals mentioned the then on-going administrative hearing, the Court of Appeals did not base its decision on the hearing. The Initial Order does not affect the positions of the parties or subject matter of the dispute currently before this Court.

*In Re All Assessments 1998*, No. M1998-00243-SC-R11-CV (Tenn. Dec. 27, 1999) (Order denying motion to consider post-judgment facts.)

The Board initially postponed equalization of utility personalty for 1999 pending a decision by its administrative judge in declaratory proceedings intended to measure the effects of § 67-5-903. After lengthy hearings, the judge concluded the statute undervalues local personalty in reportable Groups 1 and 5 by 11.1% and 16.6% respectively, and we have concurred in his findings by separate order. The affected counties have renewed their objections, and assert the Board should appropriately increase local assessments rather than reduce the utility assessments, under the authority of various Tennessee statutes and *Carroll v. Alsup*, 107 Tenn. 257, 64 S.W. 193 (1901).

*Carroll v. Alsup* involved a taxpayer who conceded his property was assessed at less than its market value but who nonetheless sought a reduction to the levels of assessment demonstrated for other properties or classes of property. The Tennessee Supreme Court rejected this argument, noting the taxpayer could properly seek to have other assessments raised but had no right to be underappraised to the level of others. *Carroll v. Alsup* remains the law of this state, but exceptions have been recognized. First, federal courts have recognized a constitutional equal protection claim by public utility companies that local assessment practices which discriminate against them in taxation can be redressed by reducing the utility assessments. Further, the legislature has since *Carroll v. Alsup* authorized equalization adjustments to mitigate the effects of different methods of assessment applicable to centrally assessed public utilities versus locally assessed property (Tenn. Code Ann. § 67-5-1302) or real property versus tangible personal property (Tenn. Code Ann. § 67-5-1509). The statutes cited by the counties, on the other hand, refer to specific authorization to the Board to change individual assessments to conform to the full value standard.

The valuation of locally assessed personal property has been established by the legislature. The State Board cannot unilaterally defy a lawfully enacted statute. To the contrary, it must "effect the assessment of property in accordance with the constitution of Tennessee and the laws of this state." Tenn. Code Ann. § 67-5-1509(a). The law specifically requires adjustment of public utility assessments to the level of property in each jurisdiction, recognizing that periodic revaluations of non-utility property may not always result in the full value assessments required by law. Tenn. Code Ann. § 67-5-1302(b).

In his ruling regarding the effects of § 67-5-903 on locally assessed personalty, Judge Hubbard made specific findings only for Groups 1 and 5. The level of underassessment for the largest category, manufacturing equipment (Group 5), was found to be 16.6%, but the average for Groups 1 and 5 would be less since the smaller Group 1 was undervalued by only 11.1%. The average may or may not be affected by other groups, but in any event these findings clearly afford a basis for equalization of the public utility personalty assessments at a level commensurate with

our actions in 1997 and 1998. The utility taxpayers have sought no greater reduction, and we have no basis to grant less. It is therefore ORDERED, that the objections of the counties and cities are overruled, and the public utility assessments will be equalized by a reduction of 15% in the tangible personal property portion of any nonforced assessments.

*In Re All Assessments 1999* (Tenn. State Bd. of Equ. Feb. 10, 2000) (Order on Objections to Tangible Personal Property Equalization).

The consortium of counties and cities, having properly appealed the 1999 Public Utility Assessments in number M2000-00399-COA-R12-CV, briefed, argued and submitted the case to this Court on January 30, 2001. During the course of these proceedings, the Tennessee Board of Equalization entered an order in all respects conforming to the February 10, 2000 order, with such order reflecting public utility assessments for the tax year 2000. This case, upon appeal, was assigned number M2000-03117-COA-R12-CV.

On April 5, 2001, the following order was entered by this Court, to-wit:

Upon the motions of the Tennessee State Board of Equalization and the consortium of counties and cities and pursuant to Tenn. R. App. P. 16(b), this appeal is hereby consolidated with App. No. M2000-00399-COA-R12-CV. The consolidated appeal shall be decided upon the briefs and argument already presented. Should any appellee deem it necessary to present additional argument related to the 2000 tax year case, they may file a supplemental brief within thirty (30) days following the entry of this order.

*In Re All Assessments 2000*, No. M2000-03117-COA-R12-CV (Tenn. Ct. App. April 5, 2001) (consolidation order).

THE PROBLEM

These cases involve centrally assessed public utility tangible personal property. Assessments of real property are not involved.

The problem has deep roots in Tennessee history.

Prior to the 1973 amendments thereto, Article II, Section 28 of the Constitution of Tennessee provided: "All property shall be taxed according to its value, that value to be ascertained in such manner as the Legislature shall direct, so that taxes shall be equal and uniform throughout the State. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of the same value, ...." *Louisville and Nashville R.R. Co. v. Public Serv. Comm'n of Tenn.*, 249 F.Supp. 894, 904-05 (M.D. Tenn. 1966), aff'd, 389 F.2d 247 (6th Cir. 1968) ("L & N I").

Historically, public utility properties were centrally assessed by the Public Service Commission. (Upon the abolition of the Public Service Commission, this duty to assess was vested in the comptroller of the treasury).[3] All other property, including commercial and industrial tangible personal property, was assessed by county assessors and local officials. The county tax rate in a given jurisdiction would be applied to all properties assessed either by the Public Service Commission or by the local assessors. If both the Public Service Commission and the county assessor followed the constitutional provision in effect prior to the 1973 amendments and the statutes implementing it, no problem would exist, as all properties would be assessed at 100% of actual cash value and the uniform tax rate would be applied to all property. Historically, however, as late as 1966, county and local assessors refused to assess local property at anything approaching its actual cash value. In fact, on an average, such properties were assessed at approximately 20% of actual cash value. *L & N I*, 249 F.Supp. at 898.

At the same time, there was serious question about whether or not the Public Service Commission valued utility properties at 100% of actual cash value. It was, however, clear in 1966 that the equalized Public Service Commission assessments were at least 55-65% of actual cash value. *Id.* at 898. Thus, when the fixed tax rate was applied to the assessed values, it was also clear that public utilities were paying three times the amount in taxes as was being paid by taxpayers locally assessed on an average 20% of actual cash value.

Tennessee law provided no remedy to the public utilities to equalize this disparity because of the decision of the Tennessee Supreme Court in *Carroll v. Alsup*. That case held that no taxpayer could challenge the existing assessments scheme unless that plaintiff could prove that his own individual property was assessed at greater than 100% of actual cash value. Thus, public utilities, assessed at 55-65% of actual cash value, could not be heard to complain about locally assessed properties being valued at an average of 20% of actual cash value since such utilities could not prove that the assessments of their own property exceeded 100% of actual cash value.

Thus, stymied in state court, L & N Railroad filed suit in the United States District Court for the Middle District of Tennessee asserting successfully that the long standing policy of the Public Service Commission assessing railroad property within the State of Tennessee at a much higher percentage of actual cash value than local assessors were assessing local property resulted in a violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. In a very scholarly opinion, United States District Judge William E. Miller sustained the equal protection claim of L & N Railroad. At the conclusion of the opinion, Judge Miller states: "Realizing the possibility that a ruling in its favor could have serious disruptive effects throughout the state, the plaintiff, in open court, offered to accept the assessment of $74,865,850.00, as determined by the State Board of Equalization, less a reduction of 15%, for the current tax biennium, without prejudice to its rights as to future tax years, and without prejudice to its insistence that the discrimination against it is represented by a much higher percentage." *L & N I*, 294 F.Supp. at 904.

---

[3]       Public Acts of 1995 Chap. 305, Sec. 124.

The decision of Judge Miller was affirmed by the Sixth Circuit Court of Appeals, 389 F.2d 247 (6th Cir. 1968).

In the wake of *L & N I*, Article II, Section 28 of the Constitution of Tennessee was amended effective January 1, 1973 to provide, as the Tennessee Supreme Court recently observed:

> In accordance with the following provisions, all property real, personal or mixed shall be subject to taxation, . . .
>
> _____*The ratio of assessment to value of property in each class or subclass shall be equal and uniform throughout the State, the value and definition of property in each class or subclass to be ascertained in such manner as the Legislature shall direct.* Each respective taxing authority shall apply the same tax rate to all property within its jurisdiction. (emphasis added).

This amendment to Article II, § 28 also divided property "for purposes of taxation," into "real property, tangible personal property and intangible personal property." Tangible personal property was further divided into subclassifications as follows:

> Tangible Personal Property shall be divided into three (3) subclassifications and assessed as follows:
> (a) Public Utility Property, to be assessed at fifty-five (55%) percent of its value;
> (b) Industrial and Commercial Property, to be assessed at thirty (30%) percent of its value; and
> (c) All other Tangible Personal Property, to be assessed at five (5%) percent of its value; provided, however, that the Legislature shall exempt Seven Thousand Five Hundred ($7,500) Dollars worth of such Tangible Personal Property which shall cover personal household goods and furnishings, wearing apparel and other such tangible property in the hands of a taxpayer.

*In Re All Assessments 1998*, 2000 WL 1710174, at * 2-3.

In construing the 1973 amendments to Article II, Section 28 of the Tennessee Constitution shortly after they became effective, the Tennessee Supreme Court said:

> The history of real property taxation in this state, and the amendment itself, leaves no doubt whatever as to the purpose and objective of Article II, Section 28. As shown by the proof in *Louisville & Nashville R.R. v. Public Service Commission*, D.C., 249 F.Supp. 894 (1966), *Affirm'd* 389 F.2d 247 (6th Cir. 1968), the railroad's

-11-

property was being assessed in the counties of Tennessee in which it operated at not less than 55% Of (sic) actual cash value, while other real property was being assessed at a statewide average of not more than 30%. In fact, according to proof in that case, properties other than utilities were being assessed in some counties as low as 7%, and in 22 counties the assessment was below 15%. The District Court and the Sixth Circuit held that practice to be in violation of the equal protection clause of the 14th Amendment.

In *Southern Railway Company v. Clement*, 57 Tenn. App. 54, 415 S.W.2d 146 (1967), the Chancellor and the Court of Appeals made it clear that in its pre-amendment status Article II, Section 28 provided no basis for the assessment of any species of property at less than its actual cash value. This Court denied certiorari in May, 1967. It is a matter of common knowledge that these two cases and the report of the Tax Study Commission created by legislative act in 1966 precipitated the amendment of Article II, Section 28, which was accomplished by the process known as Question 3.

The purpose and objective of the Question 3 amendment is to tax income-producing property at a higher rate than owner-occupied residences and farms. That such classification is constitutionally permissible is beyond question. The constitutional and statutory scheme that has resulted from the Question 3 amendment has brought about a state of uniformity and equality of assessment of real property in Tennessee that while not perfect can conservatively be described as vastly superior to its predecessor system in approaching the objective of equality and uniformity throughout the state within the classifications provided. Perfection in the taxation of real property is neither required nor attainable.

*Snow v. City of Memphis*, 527 S.W.2d 55, 65-66 (Tenn. 1975).

Despite the 1975 optimism of the Tennessee Supreme Court, the problem of unequal assessments was not resolved by the 1973 amendments to Article II, Section 28 of the Tennessee Constitution.

In 1978, L & N Railroad Company, along with five other railroads, filed suit again in the United States District Court for the Middle District of Tennessee on equal protection allegations relative to 1977 assessments. Again, the District Court found such a disparity between locally assessed properties and utility properties that the utilities were entitled to have their assessments reduced in order to more nearly conform those assessments to local assessments.

Honorable William R. Snodgrass, the Comptroller of the Treasury of Tennessee from 1955 until his retirement in 1998, described the practical problems inherent in trying to get counties to do what the law required them to do noting that counties, which do not attempt to comply with the law,

benefit because the low level of appraisal requires higher tax rates applicable to utility values. Said the comptroller:

> Somehow we've got to do something that makes it desirable for counties to do what the law requires of them to do. . . . In the past those who don't make the effort gain. Those who do make the effort are penalized, because what they do by having a low level of assessment, they have a high tax rate, and that applies to utility values. Those that make the change and try to update voluntarily automatically lose in the situation as it relates to local taxpayers as it relates to the utilities.
>
> That being the case, we have been continuing a situation that makes it politically difficult for the local officials and in fact it makes it evidently almost impossible.

*Louisville and Nashville R.R. Co. v. Public Serv. Comm'n of Tenn.*, 493 F.Supp. 162, 167 (M.D. Tenn. 1978) *aff'd.*, 631 F.2d 426 (6th Cir. 1980), *cert. denied*, 450 U.S. 959 (1981) ("L & N II"). Once again, the decision of the United States District Court for the Middle District of Tennessee was affirmed by the Sixth Circuit Court of Appeals.

Thus, the core problem predating the 1973 amendments to Article II, Section 28 of the Constitution of Tennessee continued unabated thereafter, with the equal protection violation observed by Judge William E. Miller still in place.

> Since the Fourteenth Amendment clearly prohibits unequal treatment within a class, the substantially and systematically higher assessment percentages for railroad and utility property, as opposed to other properties, is a violation of the equal protection clause of the Fourteenth Amendment, and entitles the plaintiff to relief. *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 446, 43 S.Ct. 190, 192, 67 L.Ed. 340 (1923):
>
> This court holds that the right of the taxpayer whose property alone is taxed at 100 per cent. of its true value is to have his assessment reduced to the percentage of that value at which others are taxed even though this is a departure from the requirement of the statute. The conclusion is based on the principle that where it is impossible to secure both the standard of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law.
>
> In *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 352-353, 38 S.Ct. 495, 62 L.Ed. 1154 (1918), the Court ruled:
>
> The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary

discrimination, whether occasioned by express terms of a statute or by its improper execution though duly constituted agents. And it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property.

*L & N I*, 249 F.Supp. at 902-903.

THE CONSTITUTIONALITY OF TENNESSEE CODE ANNOTATED SECTION 67-5-903(f).

The attack on the constitutionality of the application of the specific depreciation schedules contained in Tennessee Code Annotated section 67-5-903(f) to locally assessed tangible personal property must stand or fall on the assertion by Appellants that Article II, Section 28 of the Constitution of Tennessee, as it now reads subsequent to the 1973 amendments thereto, still requires that all property be assessed at 100% of its market value.

The statements by Judge Miller in *L & N I* that the Tennessee Constitution pre-1973 required all property to be assessed at 100% of actual value was correct, though unnecessary to the determination of the Fourteenth Amendment equal protection issue which was the only issue that was before the Court. The observations by Judge Morton to the effect that the post-1973 amendments to Article II, Section 28 of the Tennessee Constitution still required property to be valued at 100% of actual value were also unnecessary to the determination of the equal protection issue, which was again the only issue before the federal court in *L & N II*.

This truth is made clear by the opinion of Judge Harry Phillips on the appeal of Judge Morton's 1978 opinion.

The term "value" in Article 2 § 28 prior to the amendment was defined by T.C.A. § 67-605, since repealed, as actual cash value. For the purposes of post amendment definition, T.C.A. s 67-606 provides:

67-606. Basis of valuation.- The value of all property shall be ascertained from the evidences of its sound, intrinsic and immediate value, for purposes of sale between a willing seller and a willing buyer without consideration of speculative values, and when appropriate subject to the provision of the Agricultural, Forest, and Open Space Land Act of 1976, codified in §§ 67-650-67-658.

The willing buyer/willing seller concept, if correctly applied, would result in valuation at full market value or fair market value, in theory an appraisal figure of 100 per cent of the property's "sound, intrinsic and immediate value."

However, for the purposes of an equal protection attack, whether all property is appraised at 100 per cent or 50 per cent of the full worth is not material. The issue on this appeal is quality of the standard of assessment among the properties.

As amended in 1972, Art. 2 § 28 classifies properties for assessment purposes. In all cases, the assessment for each classification/subclassification is a percentage of "its value." Tennessee has chosen to classify properties for assessment purposes, not valuation purposes.

*L & N Railroad Co. v. Public Service Comm'n*, 631 F.2d 426, 429 (6th Cir. 1980) (emphasis added).

In *L & N I*, jurisdiction was asserted by the plaintiffs under both diversity of citizenship and the Equal Protection Clause of the Fourteenth Amendment. The federal court accepted jurisdiction under the Equal Protection Clause but, as to the diversity of citizenship allegation, observed:

[I]t is not necessary to determine whether or not relief could be granted if diversity were the sole basis of jurisdiction. The Court notes, however, that such relief might well be barred by the holding in *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and subsequent cases.

. . . .

Cases like * * * are obsolete insofar as they are based on a view of diversity jurisdiction which came to an end with *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (58 S.Ct. 817). That decision drastically limited the power of federal district courts to entertain suits in diversity cases that could not be brought in the respective State courts or were barred by defenses controlling in the State courts. (pp. 191-192, 67 S.Ct. p. 662).

. . . It is admitted that if the plaintiff brought suit in a Tennessee state court, relief would be barred by the Tennessee rule that a taxpayer cannot sue to have his own taxes reduced; he may sue only to have the taxes of his neighbors increased, and then, only if he can first show that his property is assessed in excess of actual cash value. *See e.g., Carroll v. Alsup*, 107 Tenn. 257, 284, 64 S.W. 193, 200 (1901); *McCord v. Nashville.Chattanooga & St. L. Ry.*, 187 Tenn. 277, 213 S.W.2d 196 (1948); *Mayor and Aldermen of the Town of Morristown v. Burke*, 207 Tenn. 180, 338 S.W.2d 593 (1960); and *Biltmore Hotel Court v. City of Berry Hill, Tenn.*, 390 S.W.2d 223 (1965). A citizen of Tennessee, then, could not win this action in a state court under existing state law, and he could not, because of lack of diversity, bring the action in a federal court. No sufficient reason appears why a non-citizen of this state should be able to invoke diversity jurisdiction in a federal court to reach a result on a state question which state citizens could not reach.

*L & N I,* 249 F.Supp. at 896.

*L & N II* asserted federal jurisdiction only on the basis of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. The holding in this case that article II, section 28, post 1973 amendments, still requires property to be valued, under the Tennessee Constitution, at 100% of market value is reduced to obiter dicta by the holding of the Sixth Circuit Court of Appeals that "for the purposes of equal protection attack, whether all property is appraised at 100 per cent or 50 per cent of the full worth is not material. The issue on this appeal is <u>quality of the standard of assessment among the properties</u>." *L & N II*, 631 F.2d at 429 (emphasis added).

No federal questions other than equal protection were involved in either the *L & N I* or *L & N II*. Such being the case, Tennessee courts are not bound by the obiter dicta of these federal cases. A state court is not bound to follow any federal court's decision construing the state constitution. *Glenn v. Field Packing Co.*, 290 U.S. 177 (1933); *Quality Oil Co. v. E.I. Du Pont Nemours & Co.*, 322 P.2d 731 (Kan. 1958).

The vitality of this bedrock of federalism was reaffirmed by a unanimous United States Supreme Court in 1997.

> We can easily dispense with petitioners' first contention that Idaho must follow the federal construction of a "final decision." Even if the Idaho and federal statutes contained identical language – and they do not – the interpretation of the Idaho statute by the Idaho Supreme Court would be binding on federal courts. Neither this Court nor any other federal tribunal has any authority to place a construction on a state statute different from the one rendered by the highest court of the State. See, *e.g., New York v. Ferber*, 458 US 747, 767, 102 S Ct 3348, 3359-3360, 73 L.Ed.2d 1113 (1982); *Exxon Corp. v. Department of Revenue of Wis.*, 447 US 207, 226, n. 9, 100 S Ct 2109, 2121, n. 9, 65 L.Ed.2d 66 (1980); *Commissioner v. Estate of Bosch*, 387 US 456, 465, 87 S Ct. 1776, 1782-1783, 18 L.Ed.2d 886 (1967). This proposition, fundamental to our system of federalism, is applicable to procedural as well as substantive rules. See *Wardius v. Oregon*, 412 US 470, 477, 93 S Ct 2208, 2213, 37 L.Ed.2d 82 (1973).

> The definition of the term "final decision" that we adopted in *Mitchell* was an application of the "collateral order" doctrine first recognized in *Cohen v. Beneficial Industrial Loan Corp.*, 337 US 541, 69 S Ct 1221, 93 L.Ed. 1528 (1949). In that case, as in all of our cases following it, we were construing the federal statutory language of 28 USC § 1291. While some States have adopted a similar "collateral order" exception when construing their jurisdictional statutes, we have never suggested that federal law compelled them to do so. Indeed, a number of States employ collateral order doctrines that reject the limitations this Court has placed on § 1291. Idaho could, of course, place the same construction on its Appellate Rule 11 (a)(1) as we have placed on § 1291. But that is clearly a choice for that court to make, not one that we have any authority to command.

*Johnson v. Fankell*, 520 U.S. 911, 916, 117 S.Ct. 1800, 1803-04 (1997).  A parallel rule holds that no state court is bound, even in the interpretation of the United States Constitution, by the decisions of federal district and circuit courts.

While these decisions are persuasive authority, only the decisions of the United States Supreme Court on issues of federal law are bound to be followed.  *State v. McKay*, 680 S.W.2d 447, 450 (Tenn. 1984); *State v. Carruthers*, 35 S.W.3d 516, 561 (Tenn. 2000).  Thus, we look to the appellate decisions of the Tennessee courts to determine the meaning of Article II, Section 28 of the Constitution of Tennessee and, more particularly, to determine whether or not the "full market value" constitutional requirement was abrogated by the 1973 amendments to article II, section 28.  The answer is in the affirmative.

First, in *Marion County v. State Board of Equalization*, 710 S.W.2d 521 (Tenn. Ct. App. 1986), this Court held:

> [T]here are many different definitions of value.  The constitution does not give any clue as to how value is to be determined; instead it leaves the method of determining value to the legislature.  Article 2, § 28, Constitution of Tennessee.  In T.C.A. 67-5-601, the legislature said:
>
>> (a) The value of all property shall be ascertained from the evidence of its sound, intrinsic and immediate value, for purposes of sale between a willing seller and a willing buyer without consideration of speculative values, and when appropriate subject to the provisions of the Agricultural, Forest, and Open Space Land Act of 1976, codified in Part 10 of this chapter.
>
> . . . The State in its brief in this case contends that the definition in T.C.A. § 67-5-601 is of 'fair market value.'  We are of the opinion that the correct name for this value which the legislature has described is irrelevant; what is important is the same standards be used in all cases in arriving at the value to be used for assessment purposes.

*Marion County*, 710 S.W.2d at 523.[4]

In 1987, the Supreme Court of Tennessee upheld, against constitutional attack, Chapter 337 of the Public Acts of 1977 finding correct the action of the General Assembly in declaring that all

---

        4       This last observation is the same observation made by Judge Harry Phillips for the Sixth Circuit Court of Appeals in *L & N II*.  Said Judge Phillips: "As amended in 1972, Art. 2, s 28 classifies properties for assessment purposes:  In all cases, the assessment for each classification/subclassification is a percentage of 'its value.'  Tennessee has chosen to classify properties for assessment purposes, not valuation purposes."  *L & N II*, 631 F.2d at 429.

-17-

tangible personal property, other than tangible property owned by public utilities and industrial and commercial property, had no value for the purposes of taxation. Said the supreme court:

> The Chancellor concluded that the General Assembly had acted within the authority granted to it in Art. 2, § 28,
>> ". . . the value and definition of property in each class or subclass to be ascertained in such manner as the Legislature shall direct."

> We are of the opinion that this conclusion was correct. The General Assembly concluded that no appreciable revenue could be obtained by an attempt to tax household goods and chattels or other nonbusiness tangible personal property. Such property often does not generate revenue while industrial and commercial business property does so.

> Given the fact that the 1972 amendment exempted the entire amount of individual "personal or family checking or savings accounts" and substantial amounts of tangible personal property, the attempt to levy ad valorem taxes upon private assets of individuals not used in commerce or industry proved futile and self-defeating. In our opinion the General Assembly was not constitutionally required to attempt to administer and maintain an impractical system of taxation, and it was given very broad discretion with respect to determining the value and definition of property in each of the authorized classifications or subclassifications.

> As previously stated, the earlier constitutional mandate that all property be taxed was repealed by this amendment. Instead all property was made subject to the taxing power, but the amendment did not compel or mandate that the General Assembly exhaust that power. It gave general directions concerning classifications and assessment ratios, and if the General Assembly exercised its taxing power through the use of these classifications, the ratios of assessment to value were required to be used. The method of valuation and the determination of whether there was any practical value for tax purposes were left to the General Assembly.

*Sherwood Co. v. Clary*, 734 S.W.2d 318, 321-22 (Tenn. 1987).

Under *Sherwood* and *Marion County*, section 67-5-903(f) of the Code and the depreciation schedules forming a part thereof survive constitutional attack. Under the provisions of Article II, Section 28 of the Constitution of Tennessee, the value and definition of property is "to be ascertained in such manner as the legislature shall direct."

All parties at bar agree that all sub-constitutional issues as to section 67-5-903 have been foreclosed by the opinion of the Supreme Court of Tennessee in the *In Re All Assessments* 1998 case.

THE CONSTITUTIONALITY OF T.C.A. 67-5-1302(b)(1).

Tennessee Code Annotated section 67-5-1302(b)(1) provides:

(b)(1) The assessments of public utility property, as set by the comptroller of the treasury in accordance with subsection (a), shall be adjusted, when necessary, on the basis of appropriate ratios, as are determined by the board of equalization for purposes of equalizing the values of public utility property to the prevailing level of value of property in each jurisdiction.

Tenn. Code Ann. § 67-5-1302(b)(1)(Supp. 2000). Once again the counties and cities urge that Article II, Section 28 of the Tennessee Constitution, post 1973, still requires property assessments based upon 100% of fair market value.[5] However, under *Marion County* and *Sherwood*, the fair market value basis is not constitutionally mandated, and the legislature is free to determine the method and means of valuing property. We are dealing, in this case, with personal property as opposed to real property, and practical problems of assessment result in a considerably less than perfect system.

"Appraisal ratios" or "appraisal ratio studies" are required to be conducted by the division of property assessments under Tennessee Code Annotated section 67-5-1604, 1605. The purpose of these appraisal ratio studies is "to assist the board through the division of property assessments to effect the assessment of all property throughout the state in accordance with the constitution and laws of Tennessee," and to "carry out the reappraisal and equalization programs in each county of the state." Tennessee Code Annotated § 67-5-1604(b), (c) (1998). Pursuant to this authority the real property ratios for each county are determined.

A sales ratio study for real property is simplified by recorded deeds indicating the value or consideration for a transfer of property. For personal property, however, accomplishing a satisfactory sales ratio study is much more difficult. In discussing sales ratio studies, the court in *Clinchfield R.R. Co. v. Lynch*, 527 F.Supp. 784, 787 (E.D. N.C. 1981), *aff'd* 700 F.2d 126 (4th Cir. 1983), observed:

[T]he recognized means of conducting such a study is to include only locally-assessed real estate. Such a study is reliable because it calculates from arms-length market transactions which are matters of public records. Real estate transactions may be sampled and analyzed objectively and expeditiously. In contrast, there is no objective method for determining the level of assessment of personal property. The property would have to be appraised piece by piece since there is no public record of arms-length transactions which could be sampled and analyzed.

---

[5] The irony of this situation cannot escape even the casual observer. The refusal of counties and cities for more than a century pre-1973 amendments to article II, section 28 to base local assessments on just such a premise is the alpha and omega of all ensuing problems. Had this constitutionally mandated basis of evaluation been applied by local governments there would never have been an L & N I or an L & N II. The 1973 constitutional amendments would not have been necessary, and the elaborate provisions for equalization provided in Title 67, Chapter 5 of Tennessee Code Annotated would have been of very limited applicability.

Courts in other jurisdictions have applied the real property ratio study to personal property. *See Clinchfield R.R. Co. v. Lynch*, 527 F.Supp. 784; *Clinchfield R.R. Co. v. Lynch*, 784 F.2d 545, 551 (4th Cir. 1986); *Southern Ry. Co. v. State Bd. of Equalization*, 712 F.Supp. 1557, 1568 (N.D. Ga. 1988).

Use of such sales ratios may provide the least unsatisfactory method of appraising tangible personal property, but such is a legislative decision unshackled by constitutional prohibition. Section 67-5-1509(a) of the Code mandates that locally assessed industrial and commercial personal property be adjusted by the sales ratio in each county. It necessarily follows that, to achieve equalization, public utility personal property must likewise be adjusted under section 67-5-1302(b)(1). It is not the prerogative of this Court, or of the State Board of Equalization, to question the reasonableness of a statute or second guess the policy judgments of the legislature. *BellSouth Telecomm., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997).

In the final analysis, it is the legislature that is authorized to act in the matter of assessments of personal property and equalization of such assessments, with "the value and definition of property in each class or sub-class to be ascertained in such manner as the legislature shall direct." Tenn. Const. art. II, § 28 (amended 1973).

The constitutional challenge to section 67-5-1302(b)(1) of the Tennessee Code must fail.

Once again, all parties agree that all sub-constitutional questions relative to section 67-5-1302(b)(1) are foreclosed by the November 16, 2000 decision of the Supreme Court of Tennessee relative to ad valorem assessments of public utilities company for the tax year 1998. *See In Re All Assessments 1998*, 2000 WL 1710174.

The February 10, 2000 order of the Tennessee State Board of Equalization relative to the tax year 1999 and the final order of the Tennessee State Board of Equalization as to assessments for the tax year 2000 are in all respects affirmed.

Costs of this cause are assessed against Appellants.

_____
WILLIAM B. CAIN, JUDGE